## EXHIBIT A

# AMENDMENT NO. 1
## TO
## AIRCRAFT LEASE

This AMENDMENT NO. 1 TO AIRCRAFT LEASE dated as of ___March___ __25__ , 2008 (this "Amendment") is by and between Wachovia Financial Services, Inc. ("Lessor") and CIMA Aviación, LLC ("Lessee") and amends that certain Aircraft Lease dated as of January 31, 2008 (together with any exhibits, riders and addenda thereto, the "Lease") and that certain Lease Supplement No. 1 to Aircraft Lease dated as of January 31, 2008 (together with any schedules thereto, the "Supplement", and the Supplement together with the Lease and all other documents, agreements, instruments and certificates executed and delivered in connection therewith, the "Lease Documents") each relating to one Gulfstream Aerospace G150 aircraft (the "Aircraft") and associated engines (the "Engines").

WHEREAS, Lessor and Lessee are parties to the Lease, pursuant to which Lessee leases from Lessor the Aircraft and the Engines described in and subject to the Lease;

WHEREAS, Lessor and Lessee desire to make certain amendments to the Lease;

NOW THEREFORE, in consideration of the foregoing and for other good and valuable consideration the receipt and sufficiency of which are acknowledged, Lessor and Lessee agree as follows:

1. Definitions.

Capitalized terms used but not defined in this Amendment shall have the meanings ascribed to such terms in the Lease.

2. Amendment of Lease Documents.

   (a)     Section 3(d) of the Lease is hereby deleted in its entirety and replaced as follows:

   (d) Lessee shall maintain throughout the Term a deposit or securities account with an affiliate of Lessor, which deposit or securities account shall at all times during the Term have a balance acceptable to Lessor, in its sole discretion. In connection with such deposit or securities account, Lessee shall provide any security agreements, brokerage documents, certain control agreements and any other documents or agreements as Lessor shall require.

   (b)     Exhibit A to the Lease is hereby amended by deleting in its entirety the definition of "Security Deposit".

   (c)     Schedule No. 2 to the Supplement is hereby amended by deleting the reference to "Security Deposit" and the dollar figure associated therewith.

3. Conditions Precedent.

Prior to the effectiveness of this Amendment, each of the following conditions shall have been met to Lessor's satisfaction:

   (a)     Lessee has delivered to Lessor an executed original counterpart of this Amendment.

   (b)     Lessee has delivered to Lessor executed originals of a Security Agreement and a Control Agreement, substantially in the forms attached hereto as Exhibit A and Exhibit B, respectively, in connection with the deposit or securities account referenced in Section 3(d) of the Lease.

   (c)     No Default in the Lease or other Lease Documents has occurred and is continuing, or will occur as a result of consummation of this Amendment.

4.     <u>Continued Effectiveness; Ratification</u>.

Except as amended hereby, all of the terms and conditions of the Lease and the other Lease Documents shall remain in full force and effect and are in all respects hereby ratified and affirmed. In addition, Lessee confirms that the representations and warranties set forth in the Lease are accurate for all purposes as of the date hereof.

5.     <u>Governing Law</u>.

This Amendment shall be governed by and construed in accordance with the laws of the State of New York.

6.     <u>Successors and Assigns</u>.

This Amendment shall be binding upon, inure to the benefit of and be enforceable by Lessor, Lessee and their respective successors, transferees and assigns.  Neither Lessor nor Lessee shall assign or delegate its rights and obligations under this Amendment except in accordance with an assignment or delegation of its rights and obligations under, and in accordance with the terms of, the Lease, and any other purported assignment or delegation shall be null and void *ab initio*.

7.     <u>Severable Provisions</u>.

The provisions of this Amendment are severable, and if any section or provision shall be held invalid or unenforceable in whole or in part in any jurisdiction, then such invalidity or unenforceability shall affect only such section, provision or part in such jurisdiction and shall not in any manner affect such section, provision or part in any other jurisdiction or any other section or provision in this Amendment in any jurisdiction.

8.     <u>Counterparts</u>.

This Amendment may be executed in one or more counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same Amendment.

9.     <u>Chattel Paper Counterpart</u>.

TO THE EXTENT, IF ANY, THAT THE LEASE, AS AMENDED BY THIS AMENDMENT, CONSTITUTES CHATTEL PAPER (AS SUCH TERM IS DEFINED IN THE UNIFORM COMMERCIAL CODE AS IN EFFECT IN ANY APPLICABLE JURISDICTION), NO SECURITY INTEREST IN THE LEASE AS AMENDED BY THIS AMENDMENT MAY BE CREATED THROUGH THE TRANSFER OR POSSESSION OF ANY COUNTERPART OF THIS AMENDMENT OTHER THAN THE ORIGINAL COUNTERPART MARKED "CHATTEL PAPER COUNTERPART".

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment No. 1 to Amended and Restated Aircraft Lease Agreement on the date first above written.

WACHOVIA FINANCIAL SERVICES, INC., as Lessor

By: _Linda H. Minter_
Name: ___Linda H. Minter___
Title: ___Vice President___

CIMA AVIACIÓN, LLC, as Lessee

By: _____
Name: _____
Title: _____

IN WITNESS WHEREOF, Lessor and Lessee have executed this Amendment No. 1 to Amended and Restated Aircraft Lease Agreement on the date first above written.

WACHOVIA FINANCIAL SERVICES, INC., as Lessor

By:_____

Name:_____

Title:_____


CIMA AVIACIÓN, LLC, as Lessee

By:_____

Name:_____

Title:_____

AIRCRAFT LEASE

(S/N 265)

DATED AS OF January 31, 2008

between

WACHOVIA FINANCIAL SERVICES, INC.,
as Lessor

and

CIMA Aviación, LLC
as Lessee

This is Counterpart No. 1 of a total of 4 counterparts.  Only Counterpart No. 1 shall be considered chattel paper for purposes of the Uniform Commercial Code and a security interest may be perfected only by possession of Counterpart No. 1.

```
┌─────────────────────────────────────────────────┐
│ FAA AUTHORIZATION CODE:                          │
│ _____                  │
│                                                  │
│ INTERNATIONAL REGISTRY FILE NOS.                 │
│ (AIRFRAME): _____          │
│ (ENGINE NO. 1): _____          │
│ (ENGINE NO. 2): _____          │
└─────────────────────────────────────────────────┘
```

CHAR1\1037247v5

## TABLE OF CONTENTS

SECTION 1.       Acceptance and Lease of Aircraft and Payment Instructions; Indemnity. ..........................1
SECTION 2.       Conditions to Closing; Closing Covenants. ....................................................................1
SECTION 3.       Term and Rent. ..............................................................................................................4
SECTION 4.       Limited Appointment of Agent. .....................................................................................5
SECTION 5.       Covenants and Warranties. ............................................................................................5
SECTION 6.       Representations, Warranties and Agreements of Lessee. ................................................5
SECTION 7.       Net Lease. .......................................................................................................................9
SECTION 8.       Return of Aircraft. ..........................................................................................................9
SECTION 9.       Liens. ............................................................................................................................12
SECTION 10.      Taxes. ............................................................................................................................13
SECTION 11.      Registration, Maintenance and Operation; Compliance and Use;
                 Replacement Parts; Additions; Aircraft Marking. ........................................................13
SECTION 12.      Inspection. .....................................................................................................................15
SECTION 13.      Loss or Destruction. ......................................................................................................16
SECTION 14.      Insurance. ......................................................................................................................17
SECTION 15.      Indemnification. ............................................................................................................18
SECTION 16.      Assignment and Sublease. .............................................................................................19
SECTION 17.      Tax Indemnification. .....................................................................................................19
SECTION 18.      Events of Default. ..........................................................................................................19
SECTION 19.      Remedies. ......................................................................................................................21
SECTION 20.      Performance of Obligations of Lessee by Lessor. .........................................................22
SECTION 21.      Intent. ............................................................................................................................23
SECTION 22.      Notices. .........................................................................................................................23
SECTION 23.      Purchase and Renewal Options. ....................................................................................23
SECTION 24.      Transaction Expenses. ...................................................................................................25
SECTION 25.      Miscellaneous. ..............................................................................................................25
SECTION 26.      Waivers And Amendments. ...........................................................................................26
SECTION 27.      Truth in Leasing. ...........................................................................................................26

EXHIBIT A  Definitions
Lease Supplement No. 1
          Schedule No. 1 to Lease Supplement No. 1
          Schedule No. 2 to Lease Supplement No. 1
          Schedule No. 3 to Lease Supplement No. 1
          Schedule No. 4 to Lease Supplement No. 1
          Schedule No. 5 to Lease Supplement No. 1
EXHIBIT B - Warranty Bill of Sale
EXHIBIT C - Special Tax Indemnity Addendum

## AIRCRAFT LEASE
### (S/N 265)

This AIRCRAFT LEASE (S/N 265) (together with all supplements, exhibits, certificates and attachments hereto and thereto, the "Lease") is made and entered into as of the 31st day of January, 2008 by and among WACHOVIA FINANCIAL SERVICES, INC., a North Carolina corporation ("Lessor"), One Wachovia Center, Mail Code NC0738, Charlotte, North Carolina 28288-0738, and CIMA AVIACIÓN, LLC, a Puerto Rico limited liability company having its principal place of business and chief executive office at c/o Arco Capital Management LLC, City View Plaza, Suite 800, Road 165 Km 1.2, Guaynabo, Puerto Rico 00698 ("Lessee"). Certain capitalized terms as used in this Lease are defined in Exhibit A hereto, and such definitions are hereby incorporated herein and made a part hereof as though set forth herein in full.

**SECTION 1.     Acceptance and Lease of Aircraft and Payment Instructions; Indemnity.**

(a)     Acceptance and Lease of Aircraft. Subject to the satisfaction of each condition set forth below, Lessor hereby agrees to purchase the Aircraft from the Manufacturer or supplier thereof and to lease the same to Lessee and Lessee hereby agrees to lease the same from Lessor for the Basic Term hereof pursuant to the terms and conditions of this Lease. This Lease provides an International Interest in the Aircraft in favor of Lessor.

(b)     Payment Instructions; Indemnity. (i) Payment Instructions. Lessee further authorizes and directs Lessor to make payment of any invoices submitted by Lessee in connection with the purchase of the Aircraft from the Manufacturer and provided by Lessee pursuant to each Progress Payment Instructions and the Final Payment Instructions. In order to facilitate the foregoing, so long as no Default shall have occurred and be continuing hereunder, Lessor hereby appoints Lessee as its agent to monitor the progress of the completion of the Aircraft in accordance with the terms of the Purchase Agreement and otherwise to act on behalf of Lessor with respect to the Purchase Agreement with the Manufacturer. Lessee shall not take any action that would be a breach of the Purchase Agreement, amend, modify or otherwise alter the Purchase Agreement without the prior written consent of Lessor, or subject Lessor to any claims and shall keep Lessor informed of any and all actions taken by Lessee with respect to the Purchase Agreement. Lessee will execute and deliver each Progress Payment Instructions on or prior to the time that payment is due to the Manufacturer pursuant to the Purchase Agreement and also provide to Lessor evidence of approval of each amount becoming due under the Purchase Agreement indicating or evidencing its acceptance thereof and authorizing Lessor to make payment thereof. (ii) Indemnity. As provided further in Section 15 hereof, Lessee agrees to indemnify and hold harmless Lessor and its assigns from any costs and expenses arising in connection with claims, obligations and losses, including, without limitation, late charges, penalties, premiums and similar amounts arising in connection with the Purchase Agreement (or otherwise becoming due to the Manufacturer) or invoice, other than those solely and directly attributable to the gross negligence or willful misconduct of Lessor. Notwithstanding anything herein to the contrary, any modifications to the Aircraft acquired in the manner described above (including without limitation, packing and transportation costs, custom duties, insurance, engineering fees, installation fees, testing fees and start-up fees and other costs and expenses) shall be deemed to have been irrevocably delivered and accepted for all purposes of the Lease and shall be subject to all the terms and conditions of the Lease (whether or not a Progress Payment Instructions is delivered and whether or not Lessee executes any invoice evidencing the authorization of payment thereof by Lessor) commencing on the date that the any invoice is delivered from the Manufacturer and payment is made by Lessor therefor.

**SECTION 2.     Conditions to Closing; Closing Covenants.**

(a)     Conditions Precedent. Lessor's obligations to purchase the Aircraft from the Manufacturer or supplier thereof, make any payments pursuant to a Progress Payment Instructions or Final Payment Instructions and to lease the Aircraft to Lessee are subject to and conditioned upon all of the following conditions being satisfied:

(i)     Lessor receiving on or prior to the Acceptance Date, all of the following in form and substance reasonably satisfactory to it:

(A)     a copy of this Lease and the Purchase Documents, in each case, duly executed and accompanied by evidence of authenticity and authority;

(B)     evidence of reservation of an "N" number for the Aircraft, together with an assignment of rights of Lessee in such "N" number to Lessor unless an "N" number has already been assigned and will be retained;

(C)     evidence that the Aircraft has been duly certified as to type and airworthiness by the FAA in the form of a Standard Airworthiness Certificate (FAA AC Form 8100-2) issued by the FAA;

(D)     four (4) duly executed originals of this Lease, including, Lease Supplement No. 1 and all Schedules and Exhibits thereto in proper form for filing with the FAA;

(E)     (1) such organizational documents for Lessee as requested by Lessor, (2) a certificate or certificates executed by an authorized representative of Lessee certifying that the execution, delivery and performance of this Lease, the Purchase Documents, the applicable FAA documents and the transactions contemplated hereby and thereby have been authorized by all necessary action on the part of Lessee, and (3) an incumbency certificate of Lessee containing the name(s), title(s) and specimen signatures of the person(s) authorized to execute and deliver such documents on behalf of Lessee;

(F)     certificate(s) of insurance as to the coverage required under Section 14 hereof, accompanied, if requested by Lessor, by the applicable policies and report(s) of insurance broker(s) or underwriter(s) as to the conformity of such coverage with such requirements;

(G)     evidence that each of Lessee and the Manufacturer or supplier of the Aircraft is a registered user entity and has appointed an administrator with the International Registry, that all such parties have been approved as such by the registrar of the International Registry and that each such administrator, if requested by Lessor, has consented to FAA Counsel as its professional user entity to act on such parties behalf for purposes of consenting to the registration of the International Interest provided for in the Aircraft by this Lease and the Warranty Bill of Sale with the International Registry, as applicable, and that FAA Counsel has received in escrow the executed FAA AC Form 8050-2 Aircraft Bill of Sale (the "Bill of Sale") by the Manufacturer or supplier thereof in the name of Lessor, AC Form 8050-1 Aircraft Registration Application in the name of Lessor (the "Registration Application") (except for the pink copy which will be available to be placed on the Aircraft upon acceptance thereof) and FAA AC Form 8050-135 FAA Entry Point Filing Form International Registry, releases, consents and discharges in form and substance satisfactory to Lessor, FAA Counsel and/or Lessor's counsel of any Liens, such other bills of sale, in the form of FAA AC Form 8050-2, the Warranty Bill of Sale, filing forms, or otherwise, as are necessary, in the opinion of Lessor's counsel and/or FAA Counsel to vest good and marketable title to the Aircraft in the name of Lessor, and all the foregoing (except for the Warranty Bill of Sale) being in proper form for filing with the FAA;

(H)     if requested by Lessor, an opinion of counsel for Lessee which shall include enforceability, due authorization, execution and delivery among other opinions, in each case in form and substance reasonably satisfactory to Lessor and its counsel;

(I)     the certificate(s) of good standing for Lessee from (1) the state of its organization and (2) the state in which chief executive offices and principal place of business of Lessee are located if requested by Lessor;

(J)     evidence of filing of such UCC financing statements and registration with the International Registry of Lessor's International Interest in the Aircraft (including the Airframe and each Engine) and of the Warranty Bill of Sale as deemed appropriate by Lessor's counsel;

(K)     an opinion of FAA Counsel in form and substance satisfactory to Lessor and its counsel;

(L)     each Guaranty in favor of Lessor, duly executed by each Guarantor, in form and substance satisfactory to Lessor and Lessor's counsel;

(M)     evidence of the payment of a documentation fee to Lessor;

(N)     payment of all fees and disbursements (including attorneys' fees) incurred by Lessor in the negotiation and filing of documentation;

(O)     collateral assignment(s) to Lessor of any and all subleases, management agreements, interchange agreements, charter agreements, purchase agreements and any other present and future agreements of any kind whatsoever relating to the Aircraft or any part thereof, including, without limitation, the Purchase Agreement (which assignments shall include Lessee's International Interest and associated rights therein relating to the Aircraft but shall not include any obligations, liabilities and/or duties of any kind whatsoever of Lessee or any other party, person or entity of any kind whatsoever in connection therewith or related thereto) and if requested by Lessor evidence of the registration with the International Registry of the assignment of the International Interest and associated rights of Lessee in such agreements;

(P)     receipt by Lessor of a satisfactory appraisal with respect to the Aircraft prepared by an appraiser acceptable to Lessor; and

(Q)     other documents as Lessor may reasonably request.

(ii)     no Default or Event of Default shall have occurred and be continuing.

(iii)     no material adverse change in the financial condition of Lessee or Guarantor has occurred since the date of the last financial statements furnished to Lessor as set forth on Lease Supplement No. 1.

(iv)     Lessee has accepted the Aircraft on or before the December 1, 2008.

(v)     the representations and warranties of Lessee contained herein being true and accurate as of the Acceptance Date.

(vi)     the aggregate of all amounts advanced (including the subject advance) made or being made pursuant to the terms hereof do not exceed the Maximum Aggregate Amount.

(b)     Closing Covenants.  In addition to the above listed conditions precedent, Lessee covenants and agrees that upon Lessor's acknowledgment that all the conditions to the sale and lease as aforestated have been satisfied, Lessee shall release from escrow to Lessor the documents held by FAA Counsel on behalf of Lessee and shall authorize FAA Counsel to register, file and record all appropriate documentation, including, without limitation, the Lease and Lease Supplement No. 1, with the FAA and the International Registry on the Acceptance Date.

(c)     Conditions Subsequent.  On or subsequent to the Acceptance Date, but not later than the date of the Aircraft's first flight under the leasehold conveyed herein, Lessee shall provide written confirmation to Lessor that a pink slip copy of the Registration Application has been placed within the Aircraft.

In addition, if the Aircraft is more than twelve thousand five hundred (12,500) pounds maximum certificated takeoff weight, prior to the date of the Aircraft's first flight hereunder Lessee shall provide Lessor with written confirmation that:

(i)     a copy of this Lease, including Lease Supplement No. 1, has been placed within the Aircraft;

(ii)     a copy of this Lease, including Lease Supplement No. 1, was mailed, within twenty-four (24) hours following execution thereof, to the Flight Standards Technical Division of the FAA; and

(iii)     Lessee has notified the FAA (such notification to have been given by telephone or in person to the FAA Flight Standards District Office, General Aviation District Office, Air Carrier District Office or International Field Office nearest the airport where such flight will originate) concerning the first flight of the Aircraft under this Lease at least forty-eight (48) hours prior to takeoff.

## SECTION 3.    Term and Rent.

(a)      This Lease will commence on the date that Lessor makes any payments pursuant to a Progress Payment Instructions and will continue, unless earlier terminated pursuant to the provisions hereof, until and including the Expiration Date stated in Schedule No. 2 to Lease Supplement No. 1 or, if extended in accordance with the terms hereof, until the end of any Renewal Term.

(b)      Lessee agrees to pay Lessor Supplemental Rent (defined below), without notice (notwithstanding any undertaking by Lessor to provide notice), specified in the Progress Payment Funding Instructions at the times and in the manner set forth therein.  Rent payable for the Basic Term ("Basic Rent") will commence on the Acceptance Date.  Lessee will pay Basic Rent to Lessor at its address stated below its signature, except as otherwise directed by Lessor and in the amounts and at such intervals as set forth in Schedule No. 2 to Lease Supplement No. 1.  Lessee shall pay to Lessor as Basic Rent, without notice (notwithstanding any undertaking by Lessor to provide notice) the following:

(i)      on the Acceptance Date, an amount equal to the Daily Lease Rate, multiplied by the number of days from and including the Acceptance Date with respect to the Aircraft to but excluding the First Basic Rent Date;

(ii)      on the First Basic Rent Date and on each Basic Rent Date thereafter, to and including the Last Basic Rent Date (or, upon exercise of Lessee's early purchase option, if any, the applicable Early Purchase Date), an amount equal to the Basic Rent set forth on Schedule No. 2 to Lease Supplement No. 1; and

(iii)      after the Expiration Date or any earlier date of cancellation or other termination of this Lease, until the Aircraft is returned to Lessor at the location required in and otherwise in accordance with Section 8 hereof, an amount equal to one hundred fifty percent (150%) of the Basic Rent which amount shall be payable each and every calendar month immediately after the Expiration Date or any earlier date of cancellation or other termination of this Lease, until the return of the Aircraft to Lessor at the location required in and otherwise in accordance with Section 8(a) hereof on the day of the month on which Basic Rent was payable during the Term.

(c)      In addition, Lessee shall pay to Lessor the  following amounts  (herein referred to as "Supplemental Rent" and, together with all Basic Rent, collectively as "Rent"): (i)  any amount due and payable pursuant to Schedule No. 2 to Lease Supplement No. 1 and each Progress Payment Instructions, (ii) any other amount payable hereunder which Lessee assumes the obligation to pay, or agrees to pay, under this Lease to Lessor; (iii) on the date provided herein, any amount payable hereunder as Casualty Value and/or any amounts due pursuant to Section 23 hereof plus any and all amounts regarding the same and (iv) as an administrative and late charge, an amount equal to four percent (4%) of the amount payable (or at such lower rate as may be the highest rate permitted by Applicable Law) if not paid within fifteen (15) days after the due date thereof.  Unless otherwise specified in this Lease or a Progress Payment Instructions to be paid on a particular date or within a relevant period, Supplemental Rent shall be paid within five (5) days of demand.  The expiration or other termination of Lessee's obligation to pay Basic Rent hereunder shall not terminate, limit or modify the obligations of Lessee with respect to Supplemental Rent, which shall survive such expiration or other termination.

(d)      On or prior to the first Progress Payment Funding Date, Lessee shall deposit the amount set forth in the Schedule 2 to Lease Supplement No. 1 to the Lease (the "Security Deposit") with Lessor, as security for the performance of Lessee's obligations to Lessor pursuant to this Lease.  The Security Deposit amount shall be non-interest bearing (with respect to Lessee) and shall be held by Lessor in an account, which may be a posted account and need not be segregated.  In the event that a Default or an Event of Default occurs, Lessor shall be authorized to use, retain, apply or allocate any portion or all of the Security Deposit to Lessee's obligations to Lessor hereunder or Lessor may apply any or all of the Security Deposit toward losses or expenses Lessor may suffer or incur as a result of such Default or Event of Default, without the authorization of Lessee.  Provided that no Default or Event of Default has occurred and is continuing, the remaining balance of the Security Deposit (if any), at the time of the expiration or termination of this Lease, shall be refunded to Lessee.  Provided that no Default or Event of Default has occurred and is continuing, and Lessee has exercised its option(s) to purchase the Aircraft in accordance herewith, Lessor and Lessee may agree to allocate the remaining balance of the Security Deposit (if any), at the time

of such purchase, to the purchase price of the Aircraft to be paid to Lessor hereunder.  As security for the timely and faithful performance by Lessee of all of its obligations under this Lease, Lessee hereby grants to Lessor a continuing security interest in the Security Deposit (and all sums included therein).  Lessee shall take all action necessary to maintain and perfect Lessor's security interest in the Security Deposit.  If Lessor uses, allocates or applies all or any portion of the Security Deposit in accordance herewith, such use, allocation or application shall not be deemed a cure of any Default or Event of Default, and Lessee shall, within five (5) Business Days after written demand by Lessor, deposit with Lessor, in cash, an amount sufficient to restore the amount of the Security Deposit to its state immediately prior to any such use, allocation or application and the failure of Lessee to do so shall be an Event of Default under this Lease.

(e)    All amounts required to be paid to Lessor hereunder will be made in immediately available United States funds.

**SECTION 4.    Limited Appointment of Agent.**  Lessor hereby appoints Lessee as Lessor's agent for the sole and limited purpose of accepting delivery of the Aircraft from the Manufacturer or supplier thereof.  The execution by Lessee of Lease Supplement No. 1 will evidence that the Aircraft is leased under, and is subject to all of the terms, provisions and conditions of, this Lease and will constitute Lessee's unconditional and irrevocable acceptance of the Aircraft for all purposes of this Lease.

**SECTION 5.    <u>Covenants and Warranties</u>.**

(a)    <u>Quiet Enjoyment</u>.  So long as no Default or Event of Default has occurred and is continuing, Lessee will peaceably hold and quietly enjoy the Aircraft without interruption by Lessor.

(b)    Disclaimer of Warranties.  LESSOR MAKES NO WARRANTIES, EXPRESS OR IMPLIED, AS TO ANY MATTER WHATSOEVER, INCLUDING TITLE TO, DESIGN, OPERATION, CONDITION, OR QUALITY OF THE MATERIAL OR WORKMANSHIP IN, THE AIRCRAFT OR ANY PART THEREOF, ITS MERCHANTABILITY OR ITS FITNESS FOR ANY PARTICULAR PURPOSE, THE ABSENCE OF LATENT OR OTHER DEFECTS (WHETHER OR NOT DISCOVERABLE), LACK OF INFRINGEMENT ON ANY PATENT, TRADEMARK OR COPYRIGHT, AND LESSOR HEREBY DISCLAIMS ALL SUCH WARRANTIES; IT BEING UNDERSTOOD THAT THE AIRCRAFT IS LEASED TO LESSEE "AS IS, WHERE IS." LESSEE HAS MADE THE SELECTION OF THE AIRCRAFT FROM THE MANUFACTURER OR SUPPLIER BASED ON ITS OWN JUDGMENT AND EXPRESSLY DISCLAIMS ANY RELIANCE ON ANY STATEMENTS OR REPRESENTATIONS MADE BY LESSOR.  IN NO EVENT WILL LESSOR BE LIABLE FOR ANY INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES.

(c)    Vendor Warranties.  So long as an Event of Default or Default hereunder shall not have occurred and be continuing, and so long as the Aircraft is subject to this Lease and Lessee is entitled to possession of the Aircraft hereunder, Lessor appoints Lessee as Lessor's agent and authorizes Lessee, at Lessee's expense, for the sole purpose of asserting for Lessor's account, all rights and powers of Lessor under any manufacturer's, vendor's or dealer's warranty on the Aircraft or any part thereof (including any warranty of Manufacturer or supplier).  Notwithstanding the foregoing, Lessee will not attempt to enforce any such performance by legal proceeding without Lessor's prior written approval.

**SECTION 6.    Representations, Warranties and Agreements of Lessee.**

Lessee represents, warrants and agrees as follows:

(a)    <u>Due Organization</u>.  Lessee is duly organized, validly existing and in good standing under the laws of the state of the jurisdiction of its incorporation or formation and is duly qualified to do business wherever necessary to carry on its present business and operations, including the Primary Hangar Location and to own its property.

(b)    <u>Due Authorization; No Violation</u>.  This Lease has been duly authorized by all necessary action on the part of Lessee consistent with its form of organization, does not require any further shareholder, member or partner approval, and except as described herein does not require filing or registration with, the approval of, or the giving notice to, any federal, state, local or foreign governmental authority (including the Department of

Transportation, the FAA or the International Registry) and does not contravene any law or violate any judgment or order binding on Lessee or contravene any provision of or constitute a default or result in the creation of any Lien, charge, security interest or other encumbrance (other than a Permitted Lien) under any certificate or articles of incorporation or organization or bylaws or partnership certificate or limited liability company agreement, as applicable, or any agreement, indenture, or other instrument to which Lessee is a party or by which it may be bound.

(c)     Enforceability.   This Lease has been duly executed and delivered by authorized officers or partners or members or managers, as applicable, of Lessee and constitutes the legal, valid and binding obligation of Lessee enforceable in accordance with its terms.

(d)     No Default: No Material Adverse Change.  (i) No Default or Event of Default, has occurred and is continuing and (ii) no Material Adverse Change has occurred since delivery of the most recent financial statements to Lessor pursuant to Section 6(e) hereof.

(e)     Financial Statements.   Lessee shall furnish Lessor with such information, financial or otherwise, relating to Lessee, any Guarantor or any of their subsidiaries or the Aircraft as Lessor shall reasonably request.

(f)     Location of Chief Executive Office; Lessee Name.   The chief executive office and principal place of business of Lessee is located at the address set forth in the first paragraph of this Lease, and Lessee's full and accurate legal name is as stated in the first paragraph of this Lease. Lessee's state or organization is set forth in the first paragraph of this Lease.  Lessee agrees to give Lessor thirty (30) days' prior written notice of any relocation of its chief executive office and of any change in its name, identity or state of organization.  Within the previous five (5) years Lessee has not changed its name, done business under any other names, changed its chief place of business from its present location or merged or been the surviving entity of any merger.

(g)     Documents on Board.   A current and valid Registration Application or Certificate of Aircraft Registration, and a copy of this Lease and Lease Supplement No. 1, will be kept on board the Aircraft at all times during the Term.  In addition, for all operations outside the continental United States, Lessee shall maintain either a permanent Certificate of Aircraft Registration or "fly-time wire" (FAA Standard Form 14) on board the Aircraft.

(h)     Litigation.   There are no proceedings pending or, to Lessee's knowledge, threatened against or affecting Lessee or any of its property before any court, administrative officer or administrative agency that would, directly or indirectly, (i) adversely affect or impair the title of Lessor to the Aircraft, or (ii) if decided adversely, affect the financial condition or operations of Lessee or the ability of Lessee to perform its obligations under this Lease.

(i)     No Adverse Agreements.   Lessor's right, title and interest in and to the Aircraft and the Rent will not be adversely affected or impaired by, and no lien will attach to the Aircraft as a result of, the terms of any existing mortgage, loan agreement or indenture or any other contract, agreement or instrument to which Lessee is a party, or under which Lessee or any of its property is or may become bound.

(j)     Taxes.   Lessee has filed or caused to be filed all federal, state and local tax returns required to have been filed by Lessee with respect to its business and assets and (except as otherwise provided herein) will continue to file all such required tax returns, and Lessee has paid or caused to be paid and will continue to pay all taxes that are due and payable with respect to its business and assets (except if being contested in good faith and if adequate reserves for the payment thereof have been established).

(k)     Filing.   Except for (i) registration of the Aircraft with the FAA, (ii) filing and recording of the Lease and related documents pursuant to the Act, including the filing with the FAA of an AC Form 8050-135 with respect to the International Interest provided for in the Aircraft (including the Airframe and each Engine) by this Lease and with respect to the Warranty Bill of Sale and effecting the registration of such International Interest and the Warranty Bill of Sale with the International Registry and (iii) filing of a financing statement under the UCC, no further action, including any filing, registration or recording of any document, is necessary or advisable in order to establish and perfect Lessor's title to and interest in, the Aircraft, as against Lessee and/or any other Person.

(l)    Possession and Liens.  Lessee will not sell, convey, transfer, exchange, lease or otherwise relinquish possession or dispose of the Aircraft or any Engine or Part (except for delivery of possession of the Aircraft or any Engine or Part to another Person for testing, service, repair, maintenance, overhaul or, to the extent permitted hereby, alteration, modification or sublease), or attempt or offer to do any of the foregoing.  Lessee will not directly or indirectly, voluntarily or involuntarily, create, incur, assume or suffer to exist any Liens on or with respect to the Aircraft, Lessor's title thereto, the Purchase Agreement, or any interest of Lessor therein (and Lessee will promptly, at its own expense, take such action as Lessor reasonably deems necessary or advisable to duly discharge any such Lien), except Permitted Liens.  In the event that Lessee fails to take action to discharge or remove any such Lien, Lessor may take such action as it reasonably deems necessary or appropriate to discharge or remove such Lien.  Lessee shall reimburse Lessor on demand for any reasonable costs incurred by Lessor in connection with such action together with interest at the Late Payment Rate.  Lessor's rights hereunder are in addition to, and not in derogation of, any other rights that Lessor may have hereunder, at law or in equity.

(m)    Good Title.  Lessor is or, as of the Acceptance Date, will be the owner of the Aircraft and has or, as of the Acceptance Date, will have good and marketable title to the Aircraft free and clear of all Liens other than Permitted Liens.

(n)    Records.  Lessee has reviewed all Records with respect to the operation and maintenance of the Aircraft prior to the Acceptance Date and such Records have been kept in accordance with the requirements of the FAA rules and regulations and industry standards.  Lessee will maintain all such Records during the Term in accordance with the requirements of the FAA, any Manufacturer's maintenance programs or requirements, and Sections 8 and 11 of this Lease.

(o)    Claims.  Lessee has no pending claims and Lessee has no knowledge of any facts upon which a future claim may be based, in each case for breach of warranty or otherwise, against any prior owner, any Manufacturer, or any supplier of the Airframe, any Engine, any Propeller or any Parts.

(p)    Compliance with Laws.  Lessee is and will be in compliance in all respects with all federal, state and local laws, rules and regulations applicable to the creation, use, operation, manufacture and storage of the Aircraft, its properties, operations, business, and finances, including, without limitation, any federal or state laws relating to liquor (including 18 U.S.C. § 3617, et seq.) or narcotics (including 21 U.S.C. § 801, et seq.) and/or any commercial crimes; all applicable federal, state and local laws and regulations intended to protect the environment; and the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), if applicable.

(q)    Supplements and Addenda.  Lessee shall perform all of its agreements, undertakings and obligations set forth in the supplements and addenda to the Lease and shall comply with all of the terms and conditions set forth in such supplements and addenda.

(r)    U.S. Citizen.  Lessee is now and at all times during the Term will continue to be a "citizen of the United States" within the meaning of 49 USC § 40102(a)(15) of the Act and none of Lessee, any affiliate of Lessee or any Guarantor is (i) named on the United States Department of the Treasury's Specially Designated Nationals or Blocked Persons list available through http://www.treas.gov/offices/eotffc/ofac/sdn/index.html or as shall otherwise be published from time to time, or (ii) (A) an agency of the government of a country, (B) an organization controlled by a country, or (C) a person resident in a country that is subject to sanctions under a program specified in http://www.treas.gov/offices/eotffc/ofac/sanctions/index.html or as shall otherwise be published from time to time, as such program may be applicable to such agency, organization, or person

(s)    Engines and Airframe.  Each Engine has greater than 550 rated take-off shaft horsepower or its equivalent and if it is a jet propulsion aircraft engine, has at least 1750 lb of thrust or its equivalent.  The Airframe is a type certified by the FAA to transport at least 8 people (including crew).

(t)    Charges.  All sales, use, documentation or similar taxes, fees or other charges due and payable on or prior to the date hereof with respect to the sale to and purchase by Lessor of the Aircraft and/or the leasing of the Aircraft by Lessor to Lessee have been paid in full.

(u)    Aircraft.  Lessee has selected the Aircraft, Manufacturer or supplier, as applicable, and all maintenance facilities to be used in connection with the Aircraft. Lessee hereby assigns to Lessor any and all rights relating to the Aircraft which Lessee has acquired or hereafter acquires from the Manufacturer or any other entity; provided, Lessor will have no right to exercise such right except upon the occurrence, and during the continuation of, a Default or an Event of Default.

(v)    Insolvency, Fair Consideration.  Lessee is not insolvent within the meaning of any applicable state or federal law.

(w)    Business Continuity.  Lessee will conduct its business in substantially the same manner and locations as such business is now and has previously been conducted.

(x)    Compliance with Other Agreements. Lessee will comply with all terms and conditions contained in this Lease and swap agreements with Lessor or any affiliate of Lessor, if applicable, as defined in 11 U.S.C. § 101, as in effect from time to time.

(y)    Insurance. Lessee will, in addition to the insurance required for the Aircraft, as specified below, maintain adequate insurance coverage with respect to its properties and business against loss or damage of the kinds and in the amounts customarily insured against by companies of established reputation engaged in the same or similar businesses including, without limitation, commercial general liability insurance, workers compensation insurance, and business interruption insurance; all acquired in such amounts and from such companies as are reasonably acceptable to Lessor.

(z)    Notice of Default and Other Notices.  (i) Notice of Default.  Lessee will furnish to Lessor immediately upon becoming aware of the existence of any condition or event which constitutes a Default or any event which, upon the giving of notice or lapse of time or both, may become a Default, written notice specifying the nature and period of existence thereof and the action which Lessee is taking or proposes to take with respect thereto. (ii) Other Notices.  Promptly notify Lessor in writing of (i) any material adverse change in its financial condition or its business; (ii) any material adverse claim against or affecting Lessee or any part of its properties; and (iii) the commencement of, and any material determination in, any litigation with any third party or any proceeding before any governmental agency or unit affecting Lessee.

(aa)    Payment of Debts.  Lessee will pay and discharge when due, and before subject to penalty or further charge, and otherwise satisfy before maturity or delinquency, all obligations, debts, taxes, and liabilities of whatever nature or amount, except those which Lessee in good faith disputes.

(bb)    Government Intervention. Lessee will not permit the assertion or making of any seizure, vesting or intervention by or under authority of any governmental entity, as a result of which the management of Lessee or any Guarantor is displaced of its authority in the conduct of its respective business or such business is curtailed or materially impaired.

(cc)    Judgment Entered.  Lessee will not permit the entry of any monetary judgment or the assessment against, the filing of any tax lien against, or the issuance of any writ of garnishment or attachment against any property of Lessee or debts due to Lessee.

(dd)    Transacting User Entity.  Lessee is a Transacting User Entity and has designated a Professional User Entity acceptable to Lessor.

(ee)    Consent to International Registry Filings.  Lessee hereby consents to the registration of any International Interest evidenced by this Lease and/or any Lease Document in favor of Lessor and hereby agree to authorize and direct its Professional User Entity to consent to the registration of any International Interest with the International Registry upon request therefor by Lessor.   At closing, Lessee hereby agrees to authorize its Professional User Entity to consent to the registrations of any International Interests.

(ff)    Information on Schedules.  The information contained on Schedule No. 1 to Lease Supplement No. 1 (including the registration number of the Airframe, the serial numbers of the Airframe and the Engines, and manufacturer and model numbers of the Airframe and Engines) is true, correct and complete in all respects.

(gg)    Sale/Leaseback.  If the transaction evidenced hereby or to which this Lease relates is a sale/leaseback transaction, Lessee represents and warrants as follows: (i) the sale of the Aircraft by Lessee to Lessor and Lessee's undertaking of the obligations contained herein will not cause Lessee to be insolvent within the meaning of applicable state and/or federal laws; (ii) the payment by Lessor to Lessee of Lessor's Cost is fair consideration for the Aircraft within the meaning of applicable state and federal laws; (iii) the sale by Lessee to Lessor of the Aircraft does not and when consummated will not (A) require any stockholder, partner or member approval or consent of any trustee or holders of any indebtedness or obligations of Lessee, (B) contravene any laws, statutes, regulations, judgments or decrees applicable to Lessee, including laws or statutes regarding fraudulent conveyances, bankruptcy, creditors' rights or bulk transfers, or the certificate of incorporation or bylaws or other organizational documents of Lessee, (C) contravene the provisions of, or constitute a default under, or violate any restrictive covenants contained in, any agreement to which Lessee is a party or by which Lessee or its assets may be bound or affected; (iv) all authorizations, approvals, licenses, filings and/or registrations with any court or governmental agency or instrumentality that is necessary in connection with the sale by Lessee to Lessor have been obtained or accomplished and a written copy of each of them has been delivered to Lessor; (v) Lessee has full power, authority and legal right to dispose of the Aircraft, including the right to sell the Aircraft to Lessor; and (vi) the sale of the Aircraft to Lessor has been duly authorized by all necessary corporate action and the obligation evidenced by Lessee's agreement to sell the Aircraft to Lessor constitutes a legal, valid and binding obligation of Lessee.

**SECTION 7.    Net Lease.**

THIS LEASE IS A NET LEASE.  LESSEE'S OBLIGATIONS TO PAY RENT AND PERFORM ITS OBLIGATIONS HEREUNDER ARE ABSOLUTE, IRREVOCABLE AND UNCONDITIONAL AND WILL NOT BE SUBJECT TO ANY RIGHT OF SETOFF, COUNTERCLAIM, DEDUCTION, DEFENSE OR ANY RIGHT LESSEE MAY HAVE AGAINST THE SUPPLIER, MANUFACTURER, LESSOR OR ANY OTHER PERSON; PROVIDED, HOWEVER, THAT NOTHING HEREIN WILL PRECLUDE LESSEE FROM ASSERTING ANY SUCH CLAIMS IN A SEPARATE CAUSE OF ACTION. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THIS LEASE WILL NOT TERMINATE, NOR WILL THE OBLIGATIONS OF LESSEE BE AFFECTED, BY REASON OF ANY DEFECT IN OR DAMAGE TO, OR ANY LOSS OR DESTRUCTION OF, THE AIRCRAFT OR ANY PART THEREOF FROM WHATSOEVER CAUSE, OR THE INVALIDITY OR UNENFORCEABILITY OR LACK OF DUE AUTHORIZATION OF THIS LEASE OR LACK OF RIGHT, POWER OR AUTHORITY OF LESSOR TO ENTER INTO THIS LEASE, OR FOR ANY OTHER CAUSE, WHETHER SIMILAR OR DISSIMILAR TO THE FOREGOING, ANY PRESENT OR FUTURE LAW OR REGULATION TO THE CONTRARY NOTWITHSTANDING, IT BEING THE EXPRESS INTENTION OF LESSOR AND LESSEE THAT ALL RENT PAYABLE TO LESSOR HEREUNDER WILL BE, AND CONTINUE TO BE, PAYABLE IN ALL EVENTS UNLESS AND UNTIL THE OBLIGATION TO PAY THE SAME ARE FULLY SATISFIED PURSUANT TO THE EXPRESS PROVISIONS HEREOF.  LESSEE UNDERSTANDS AND AGREES THAT NEITHER THE SUPPLIER OR THE MANUFACTURER, NOR ANY SALES REPRESENTATIVE OR OTHER AGENT OF EITHER OF THEM, IS AN AGENT OF LESSOR OR IS AUTHORIZED TO WAIVE OR ALTER ANY TERM OR CONDITION OF THIS LEASE, AND NO SUCH WAIVER OR ALTERATION WILL VARY THE TERMS HEREOF. LESSOR IS NEITHER A SUPPLIER NOR A MANUFACTURER, AND LESSOR IS NOT RESPONSIBLE FOR REPAIRS, SERVICE OR DEFECTS IN THE AIRCRAFT OR ANY PART THEREOF. LESSEE AGREES NOT TO ASSERT AGAINST LESSOR ANY CLAIMS OR DEFENSES LESSEE MAY HAVE WITH RESPECT TO THE AIRCRAFT OR ANY PART THEREOF, AND UNDERSTANDS THAT IT MAY ASSERT SUCH CLAIMS AGAINST THE SUPPLIER OR MANUFACTURER.

**SECTION 8.    Return of Aircraft.**

(a)    Condition Upon Return. Upon the expiration or other termination of this Lease (whether following an Event of Default or otherwise), unless Lessee shall have purchased the Aircraft in accordance with the terms hereof, Lessee, at its own expense, will return the Aircraft (including the Engines) to Lessor at a location specified by Lessor within the continental United States with no deferred maintenance items outstanding and in the condition

in which the Aircraft is required to be maintained pursuant to the terms of this Lease.  Without limiting the generality of the foregoing, upon return the Aircraft will:

    (i)     have a valid US FAA Certificate of Airworthiness;

    (ii)    be free and clear of all Liens other than Permitted Liens;

    (iii)   be in the same configuration, in the same operating and physical condition, with all systems operating normally, and in good appearance (in each case, ordinary wear and tear excepted) as when delivered to Lessee hereunder;

    (iv)   be in compliance with all so-called "mandatory," "alert" and (to the extent applicable to Lessee, or its operations) "highly recommended" or other service bulletins, service letters, modification kits, and similar notices and components issued, supplied, or available by or through the Manufacturer and/or the Manufacturer of any engine or part with respect to the Aircraft, and with all "airworthiness alerts" and airworthiness or other directives, circulars, operator bulletins and instructions and all other applicable service, maintenance,

    (v)    otherwise be in the condition required under this Lease.

(b)    <u>Overhaul-General</u>.  At the time of return:

    (i)     the Airframe (including the landing gear) will not have been operated more than one-half of the allowable time between major airframe overhauls or major block maintenance before the next major airframe overhaul or major block maintenance, whichever then applies, in accordance with Lessee's then approved overhaul and/or maintenance program authorized by and performed to FAA requirements applicable to Lessee or the Airframe, and will have no less than half life (as measured by reference to calendar, phase, periodic maintenance, and/or inspection standards) remaining on any life limited Airframe Part or component (including the landing gear) before overhaul or replacement; and

    (ii)    each Engine will not have been operated more than one-half of the allowable time remaining before overhaul (both hot and cold sections as measured by reference to calendar, phase, periodic maintenance, and/or inspection standards) and all cycle limited Parts or time controlled components of each Engine will not have been operated more than one-half the allowable cycles or time remaining before replacement; said Engine overhaul and Engine Parts and components replacement to be performed in accordance with Lessee's then approved engine overhaul and parts and components replacement program authorized by and performed to FAA requirements applicable to Lessee; and

    (iii)   Lessee will have performed all inspections and scheduled maintenance required to be performed on the Airframe, Propeller(s), Engines and all life limited Parts and components within one hundred eighty (180) days after the date of return and one hundred fifty (150) hours of additional operation after the hour of return.

(c)    <u>Overhaul-Airframe</u>.

    (i)     If the conditions set forth in Sections 8(b)(i) and (iii) hereof are not met, Lessee will pay Lessor a dollar amount computed by multiplying (A) Lessor's then current cost for such major overhaul or major block maintenance as the case may be (such cost being the then current rates charged by an airframe overhaul facility approved by the Manufacturer and acceptable to Lessor, together with all costs associated with such overhaul), times (B) a fraction of which (x) the numerator is the excess of the number of hours since the last such major overhaul or major block maintenance, as the case may be, over fifty percent (50%) of the number of hours of allowable time between major overhauls or major block maintenance and (y) the denominator is the total number of hours of such allowable time.

    (ii)    If the life limited Parts or components requirement contained in Section 8(b) hereof are not met, Lessee will pay to Lessor with respect to each Part or component for which said requirement is not

met the dollar amount obtained by multiplying (A) the ratio that the life expended in excess of half-life bears to the total allowable life for such Part or component by (B) Lessor's cost of replacement of such Part or component. Lessor's cost of replacement of such Part or component will include Lessor's then current cost of purchasing the Part or component itself and all of Lessor's then current costs associated with the replacement.

(d)     Overhaul-Engine.

(i)      If the conditions specified in clause (ii) and/or (iii) of Section 8(b) hereof are not met with respect to the Engines, Lessee will pay to Lessor with respect to each Engine for which said conditions are not met the dollar amount per Engine obtained by multiplying (A) the ratio that the time accumulated since half time bears to the time allowable between overhauls by (B) Lessor's cost for overhaul of such Engine (such Lessor's cost being the then current rates charged by an engine overhaul facility approved by the Manufacturer and acceptable to Lessor, together with all costs associated with such overhaul).

(ii)      If the conditions specified in clause (ii) and/or (iii) of Section 8(b) hereof are not met with respect to Engine cycle limited Parts and time controlled components, Lessee will pay to Lessor with respect to each Engine for which said requirement is not met the dollar amount per Part or per component, as applicable, obtained by multiplying (A) the ratio that the time (or cycles) accumulated since half time (or one-half the allowable cycles) bears to the time (or cycles) allowable between replacements by (B) Lessor's cost of replacement of the part (or component). Lessor's cost of replacement of a part or component will include Lessor's then current cost of purchasing the part or component itself and all of Lessor's then current costs associated with the replacement.

(e)     Fuel; Records. Upon the return of the Aircraft:

(i)      each fuel tank will contain the same quantity of fuel as was contained in such tank when the Aircraft was delivered to Lessee on the Acceptance Date, which will be presumed to be fifty percent (50%) of full capacity unless otherwise specified in the Purchase Documents. If the fuel tank(s) contain less than such amount, Lessee will pay to Lessor the cost, at the then current market price of fuel, of the amount of fuel necessary to bring the fuel level to the required amount; and

(ii)      Lessee will deliver all Records to Lessor. If any Records are missing or incomplete, Lessor will have the right to cause any such Records to be reconstructed at the sole expense of Lessee.

(f)     Storage. Upon the expiration, cancellation or other termination of the Lease, Lessee will, if requested by Lessor, permit Lessor to store the Aircraft at the Primary Hangar Location for up to one hundred eighty (180) days. During such storage period Lessee will, at its own expense, keep the Aircraft properly hangared, and Lessee will permit Lessor or any person designated by Lessor, including the authorized representative or representatives of any prospective purchaser, lessee or user of the Aircraft to inspect the same. Lessee shall bear the risk of loss and shall pay any and all expenses connected with insuring and maintaining the Aircraft during such storage period. Notwithstanding the foregoing, upon the cancellation or termination of the Lease in connection with an Event of Default, the storage period provided for in this paragraph and the obligation to hangar and insure the Aircraft shall be unlimited.

(g)     Return of Engines. If, notwithstanding the requirement set forth in Section 8(a) that Lessee return the Engines to Lessor, Lessee wishes to return the Aircraft with an engine other than an Engine installed on the Airframe and if Lessor is willing in its sole reasonable discretion to accept such engine, then concurrently with such return Lessee will, at its sole expense, furnish Lessor with (i) a full warranty bill of sale, in form and substance satisfactory to Lessor, with respect to each such engine, (ii) a written opinion of FAA Counsel to the effect that such engine is free and clear of all Liens other than Lessor's Liens and take such other steps as are necessary to effect the registration of such sale with the International Registry. Upon receipt of the bill of sale and opinion, unless a Default or Event of Default has occurred and is continuing, Lessor will transfer to Lessee on an "AS-IS, WHERE-IS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY (OTHER THAN AS TO LESSOR'S LIENS) BY, OR RECOURSE TO, LESSOR, all of Lessor's right, title and interest in and to the Engine that was replaced by the engine.

(h)     Inspection Prior to Return.  Not more than ninety (90) days prior to the Expiration Date, upon the written request of Lessor, Lessee will, at its sole expense, (i) review the maintenance records of the Aircraft to determine if the Aircraft is in the condition required by the Lease, and (ii) deliver to Lessor a written certificate (x) certifying that the Aircraft is in the condition required by the Lease according to the maintenance records for such Aircraft, or (y) if the maintenance records so indicate, certifying that maintenance or repairs are required and specifying what maintenance or repair is required in order to bring the Aircraft to the required condition.

(i)     Survival.  The provisions of this Section 8 will survive the expiration or other termination of this Lease and the return of the Aircraft for any reason whatsoever.

(j)     Injunctive Relief.  Without limiting any other terms or conditions of this Lease, the provisions of this Section 8 are of the essence in this Lease, and upon application to any court of equity having jurisdiction, Lessor will be entitled to a decree against Lessee requiring specific performance of the covenants of Lessee set forth in this Section 8.

(k)     Excess Use.  Upon the return of the Aircraft to Lessor, Lessor and Lessee shall consult for the purpose of determining the Excess Use Amount (as defined below), if any, and any amount so agreed upon in writing between Lessor and Lessee shall be binding on both parties.  The "Excess Use Amount" means the amount, if any, by which (i) the fair market sales value of the Aircraft (determined pursuant to Section 23(c)) without such Excess Hours, exceeds (ii) the fair market sales value of the Aircraft (determined pursuant to Section 23(c)) with such Excess Hours (and as to this Section 8(k)(ii), without making the assumption in Section 23(c)(iii)).  If Lessor and Lessee fail to agree within (10) days after the return of the Aircraft to Lessor, then Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine the Excess Use Amount.  Lessee agrees to pay the costs and expenses of any such determination and appraisal.  The independent appraiser shall be required to complete such determination as promptly as practicable, but in any event, not later than thirty (30) days after the date on which it is appointed.  A final determination by the independent appraiser regarding the extent of the Excess Use Amount, if any, shall be binding on Lessor and Lessee.  Lessee shall pay to Lessor within ten (10) days of determination an amount equal to the Excess Use Amount.

(l)     Damage History.  If Lessor is of the opinion that the Aircraft's fair market sales value is diminished due to the existence of any damage history, Lessor and Lessee shall consult for the purpose of determining the Diminution Amount (as defined below), and any values agreed upon in writing between Lessor and Lessee shall be binding on both parties.  The "Diminution Amount" means the amount by which (i) the Fair Market Sales Value of the Aircraft without such damage history, exceeds (ii) the Fair Market Sales Value of the Aircraft with such damage history (and as to this Section 8(j)(ii), without making the assumption in Section 23(c)(iii)).  If Lessee and Lessor fail to agree within ten (10) days after the return of the Aircraft to Lessor, then Lessor shall appoint an independent appraiser (reasonably acceptable to Lessee) to determine the Diminution Amount.  Lessee agrees to pay the costs and expenses of any such determination and appraisal.  The independent appraiser shall be required to complete such determination as promptly as practicable, but in any event, not later than thirty (30) days after the date on which it is appointed.  A final determination by the independent appraiser regarding the extent of any Diminution Amount shall be binding on Lessee and Lessor.  Lessee shall pay to Lessor within ten (10) days after the independent appraiser's determination an amount equal to the Diminution Amount, if any.

(m)     Projected Realized Value.  Upon the expiration of the Term of this Lease, unless Lessee shall have purchased the Aircraft in accordance with the terms hereof, if Lessor elects to sell the Aircraft and the net sales proceeds received by the Lessor in connection with the sale of the Aircraft (the "Terminal Value") shall be less than the Projected Realized Value, Lessee agrees to pay to Lessor as Supplemental Rent the difference between such Projected Realized Value and the Terminal Value within ten (10) days of demand by Lessor upon Lessee.

SECTION 9.     Liens.  Lessee will not directly or indirectly, voluntarily or involuntarily, create, incur, assume, consent to or suffer to exist any Liens other than Permitted Liens on or with respect to the Aircraft or any part thereof, Lessor's title thereto, or any interest of Lessor therein, and Lessee will promptly, at its own expense, take such action as Lessor deems necessary or advisable to duly discharge any such Lien.  If Lessee fails to take action to discharge or remove any such Lien, Lessor may take such action as it deems necessary or appropriate to discharge or remove such Lien.  Lessee will reimburse Lessor on demand for any costs incurred by Lessor in

connection with such action. Lessor's rights hereunder are in addition to, and not in derogation of, any other rights Lessor may have hereunder, at law, or in equity.

SECTION 10.   Taxes.   Lessor will be responsible for reporting and paying to the applicable jurisdiction, and Lessee will pay to Lessor when due and will defend and indemnify Lessor, on a net after-tax basis, from and against liability for, all sales and use taxes and all taxes that are the equivalent of sales or use taxes (including any related interest, penalties and additions to tax) now or hereafter imposed by any federal, state, local or foreign governmental body or agency or other taxing authority upon the Aircraft or the leasing thereof or otherwise with respect to the transactions contemplated hereby. Except to the extent such impositions are included in the preceding sentence, Lessee will (i) report, (ii) pay when due, and (iii) defend and indemnify Lessor, on a net after-tax basis, from and against liability for all license and registration fees, assessments, and property, excise, documentary, privilege, withholding and other taxes (including any related interest, penalties and additions to tax) or other charges or fees now or hereafter imposed by any federal, state, local or foreign governmental body or agency or other taxing authority upon the Aircraft, or with respect to landing, airport use, manufacturing, ordering, shipment, purchase, ownership, delivery, installation, leasing, operation, possession, use, return, or other disposition thereof or the rentals hereunder (together with sales, use and equivalent taxes, "Impositions"), other than taxes on or measured solely by the net income of Lessor. Any Impositions paid by Lessor upon failure of Lessee to make such payments will immediately become due from and payable by Lessee to Lessor. Notwithstanding the foregoing, Lessee will pay and will indemnify, defend, and hold harmless Lessor, on a net after-tax basis, from and against all Impositions on or measured by the net income of Lessor imposed against Lessor by any local or foreign government or other local or foreign taxing authority if and to the extent Lessor would not have incurred such Impositions but for the operation or presence of the Aircraft in the jurisdiction asserting an Imposition. In the event any reports with respect to Impositions are required to be made, Lessee will either prepare and file such reports or, if it shall not be permitted to file the same, it will notify Lessor in writing of such reporting requirements, prepare such reports in such manner as shall be reasonably satisfactory to Lessor and deliver the same to Lessor within a reasonable period prior to the date the same is to be filed. Lessee shall provide such information Lessor may reasonably require from Lessee to enable Lessor to pursue or fulfill its tax filing, tax audit, and tax litigation rights and obligations.

SECTION 11.   Registration, Maintenance and Operation; Compliance and Use; Replacement Parts;
Additions; Aircraft Marking.

(a)   Registration, Maintenance and Operation.   During the Term, Lessee, at its sole cost and expense, will (i) cause the Aircraft to be duly registered in the name of Lessor under the Act at all times; (ii) maintain, inspect, service, repair, overhaul and test the Airframe, any Propellers and each Engine in accordance with FAA approved and Manufacturer's recommended maintenance programs and in accordance with (A) all maintenance manuals furnished with the Aircraft, including all subsequent amendments or supplements to such manuals issued by the Manufacturer from time to time, (B) all mandatory "Service Bulletins" issued, supplied, or available by or through any Manufacturer and/or any other manufacturer of any Engine or Part having a compliance date during the Term of this Agreement or the last day of any Renewal Term, (C) all non-mandatory "Service Bulletins" relating to airworthiness issued, supplied, or available by or through any Manufacturer and/or any other manufacturer of any Engine or Part having a compliance date during the Term of this Agreement or the last day of any Renewal Term, and (D) all airworthiness directives or circulars issued by the FAA or similar regulatory agency having jurisdictional authority, and causing compliance with such directives or circulars to be completed through corrective modification or operating manual restrictions, having a compliance date during the Term or the last day of any Renewal Term; (iii) maintain (in English) all Records, (iv) promptly furnish to Lessor such information as may be required to enable Lessor to file any reports required by any governmental authority as a result of Lessor's ownership of the Aircraft, and (v) at the request of Lessor, enter into or cause to be entered into, manufacturer's or supplier's standard maintenance contracts satisfactory to Lessor covering the Aircraft and shall comply with all obligations thereunder, and shall furnish evidence to Lessor of such signed maintenance agreement (substitute maintenance may be used if necessary and if first approved in writing by Lessor). All maintenance procedures required by Section 11, subparagraph (a)(ii) or any other provision of this Lease will be performed in accordance with all FAA and Manufacturer's standards and procedures by properly trained, licensed, and certified maintenance sources and maintenance personnel using replacement parts approved by the FAA and the Manufacturer, so as to keep the Airframe, any Propellers and each Engine in as good operating condition as when delivered to Lessee hereunder, ordinary wear and tear alone excepted, and to enable the airworthiness certificate for the Aircraft to be continually maintained in good standing at all times under the regulations of the FAA.

(b)     Compliance and Use.  (i) Lessee will operate the Aircraft solely in the conduct of its business and/or for commercial purposes (and not for consumer, home or family purposes) and in such configuration as authorized by the FAA.  Lessee will not operate the Aircraft or permit the Aircraft to be operated (A) at any time or in any geographic area when or where insurance required by the provisions of Section 14 hereof is not in effect, (B) in a manner or for any time period such that Lessor or a Person other than Lessee will be deemed to have "operational control" of the Aircraft without the prior written consent of Lessor, or (C) for the carriage of persons or property for hire or the transport of mail or contraband.  Throughout the Term, possession, use and maintenance of the Aircraft will be at the sole risk and expense of Lessee and the Aircraft will be based at the Primary Hangar Location set forth in Schedule No. 2 to Lease Supplement No. 1.  Lessee shall give to Lessor five (5) days prior written notice of any proposed change of the Primary Hangar Location of the Aircraft.  Lessee will bear the cost associated with any such move of the Primary Hangar Location of preparing, filing and/or registering any documents or interests necessary to the protect interest of Lessor in the Aircraft, the Lease and the interest created hereby.  Lessee will deliver to Lessor a written waiver of any Lien or claim of Lien against the Aircraft that is or could be held by any landlord (other than a governmental entity) or mortgagee of any hangar or storage facility where the Aircraft is or will be located.  Lessee will not remove the Aircraft, or permit the Aircraft to be removed, from its designated Primary Hangar Location for a period in excess of thirty (30) days without Lessor's prior written consent.  Lessee will cause the Aircraft to be operated at all times by duly qualified pilots who (x) are supplied by Lessee, (y) hold at least a valid commercial airman certificate and instrument rating and any other certificate, rating, type rating or endorsement appropriate to the Aircraft, purpose of flight, condition of flight or as otherwise required by the FARS or other applicable law or regulation, and (z) meet the requirements established and specified by the insurance policies required hereunder and the FAA.  THE AIRCRAFT WILL NOT BE OPERATED, USED OR LOCATED OUTSIDE THE CONTINENTAL UNITED STATES, ALASKA, PUERTO RICO OR CANADA, EXCEPT AS EXPRESSLY PERMITTED BY THE FOLLOWING PARAGRAPH.

NOTWITHSTANDING THE FOREGOING, THE AIRCRAFT MAY BE FLOWN TEMPORARILY TO ANY COUNTRY IN THE WORLD IN CONNECTION WITH THE CONDUCT OF LESSEE'S BUSINESS; PROVIDED, HOWEVER, THAT PREDOMINANT USE, AS DEFINED IN THE CODE, OF THE AIRCRAFT SHALL BE IN THE UNITED STATES AND PUERTO RICO; AND, PROVIDED, FURTHER, THAT IN NO EVENT MAY THE AIRCRAFT FLY, BE OPERATED, USED OR LOCATED IN, TO OR OVER ANY COUNTRY OR GEOGRAPHIC REGION: (A) IN WHICH SUCH AIRCRAFT IS NOT SPECIFICALLY AND FULLY COVERED BY THE INSURANCE POLICY IN EFFECT WITH RESPECT TO SUCH AIRCRAFT IN ACCORDANCE WITH THE TERMS OF SECTION 14 HEREOF; OR (B) IN CONNECTION WITH WHICH THE FAA OR THE UNITED STATES DEPARTMENT OF STATE HAS ISSUED THEN CURRENT TRAVEL RESTRICTIONS OR WARNINGS ON THEIR RESPECTIVE WEBSITES; OR (C) WITH WHICH THE UNITED STATES OF AMERICA DOES NOT MAINTAIN DIPLOMATIC RELATIONS; OR (D) WHICH IS ON THE EMBARGOED COUNTRY LIST PUBLISHED FROM TIME TO TIME BY THE OFFICE OF FOREIGN ASSETS CONTROL (OFAC); OR (E) IN WHICH TRAVEL TO SUCH LOCATION WOULD OTHERWISE VIOLATE U.S. LAW.

(c)     Replacement Parts.  Except as otherwise provided in the succeeding paragraph (d) of this section, Lessee may, at its sole cost and expense:  (A) install on the Aircraft such items of substantially the same type (and with respect to an Engine, of the same make and model, or otherwise comparable engine acceptable to Lessor and compatible with the other Engine(s) and with a fair market value, remaining useful life and utility at least equal to, and in as good operating condition as, the item it is replacing (assuming such replaced item was of the value and utility and in the condition and repair as required by the terms hereof immediately prior to its replacement) in temporary replacement, pending overhaul or repair of the unsatisfactory item; provided, however, that such temporary replacement items must be in such a condition as to be permissible for use upon the Aircraft in accordance with the standards for maintenance and other provisions set forth in this Agreement; provided, further, however, that Lessee must, at all times, retain unencumbered title (subject to liens of mechanics, materialmen and other vendors, which are extinguished in normal course of business) to any and all items temporarily removed; or (B) promptly replace all Parts that from time to time become worn out, lost, stolen, taken, destroyed, seized, confiscated, requisitioned, damaged beyond repair or permanently rendered or declared unfit for use for any reason whatsoever with a replacement part of at least the same manufacture, value, remaining useful life and utility as the replaced Part immediately preceding the replacement (assuming that such replaced Part is in the condition required by this Lease).  Such replacement part will be free and clear of all Liens.  Upon installation, attachment or incorporation in, on or

into the Aircraft, immediately and without further act such replacement part will be fully subject to the Lease and title thereto will vest in Lessor. If such replacement part is in respect to an Engine, Lessee shall cause a supplement to this Lease, in form and substance satisfactory to Lessor, subjecting the replacement engine to the lien of this Lease, to be filed for recordation with the FAA and creating in favor of Lessor an International Interest in such replacement engine to be registered with the International Registry.

(d)     Additions.  Lessee will be entitled from time to time during the Term to acquire and install on the Aircraft at Lessee's sole cost and expense (and Lessor hereby appoints Lessee to be Lessor's agent for such purpose so long as no Default or Event of Default has occurred and is continuing), any additional accessory, device or equipment as may be available at such time ("Additions") but only if (i) such Additions are ancillary to the Aircraft, (ii) such Additions are not required to render the Aircraft complete for its intended use by Lessee, (iii) such Additions will not impair the originally intended function or use of the Aircraft or diminish the value of same, (iv) such Additions can be readily removed without causing material damage to the Aircraft, and (v) the incorporation of such Additions into the Aircraft will not result in a violation of the provisions of any FARS or other applicable law, rule or regulation. Any such Additions shall remain the property of Lessee except for any Addition that constitutes an Alteration (as defined below); provided, that Lessee shall notify Lessor of such Additions at least thirty (30) days prior to the expiration of the Term, and Lessor may elect to purchase at fair market value any such Additions. If Lessor does not elect to purchase such Additions, Lessee shall remove such Additions and shall repair any damage to the Aircraft prior to the return of the Equipment to Lessor. Any readily removable Addition not described in Section 11(c) and not removed by Lessee prior to the return of the Aircraft shall at Lessor's option either be removed at Lessee's cost or become part of the Aircraft and property of Lessor.

(e)     Alterations.  Lessee will, at its expense, make any and all alterations and modifications (each an "Alteration") with respect to the Aircraft that may at any time during the Term be required to comply with any applicable law or any government rule or regulation. All Alterations and all nonseverable repairs made by Lessee to or upon the Aircraft, including any Engine or replacement Parts installed thereon, in the course of repairing or maintaining the Aircraft will be deemed an accession, and title thereto will immediately vest in Lessor without cost or expense to Lessor.

(f)     Aircraft Marking.  Lessee agrees, at its sole cost and expense, to (i) cause the Airframe, any Propellers and the Engines to be kept numbered with the identification or serial number therefor as specified in Schedule No. 1; (ii) prominently display on the Aircraft that "N" number, and only that "N" number specified in Schedule No. 1, or such other "N" number as has been approved in writing by Lessor and duly recorded with the FAA; (iii) (A) notify Lessor in writing not less than thirty (30) days prior to making any change in the configuration, appearance or coloring of the Aircraft (other than changes mandated by the FAA or that are reasonably consistent with the configuration, appearance and coloring on the Acceptance Date), and (B) at Lessor's request, either (x) restore the Aircraft to the configuration, appearance and coloring as of the Acceptance Date (other than changes that were mandated by the FAA) or (y) pay Lessor an amount equal to the reasonable cost of such restoration; and (iv) at the request of Lessor, affix and maintain in the Airframe adjacent to the airworthiness certificate and on each Engine a metal nameplate bearing the aircraft marking specified by Lessor ("Aircraft Marking") and such other markings as from time to time may be required by law or otherwise deemed necessary or advisable by Lessor in order to protect Lessor's title to the Aircraft and Lessor's rights hereunder. Lessee will not operate the Aircraft until such Aircraft Markings have been placed thereon. Lessee will promptly replace or repair, as applicable, any such Aircraft Marking that may be removed, defaced or destroyed.

SECTION 12.   Inspection.  Lessor will have the right, but not the duty, to inspect the Aircraft, any component thereof, and the Records during normal business hours and from time to time, wherever the same may be located, upon reasonable prior written notice to Lessee unless a Default or Event of Default has occurred and is continuing, in which case no prior notice will be required. Lessee will, at any reasonable time and from time to time, make the Aircraft and/or the Records available to Lessor for inspection. Lessee will confirm to Lessor the location of the Aircraft (i) within five days (5) after receiving a written request therefore, the exact hangared location of the Aircraft, and (ii) if a Default shall have occurred and be continuing, within five (5) days after written request therefore, the exact location of the Aircraft.

## SECTION 13.  Loss or Destruction.

    (a)    <u>Event of Loss with Respect to the Aircraft</u>.

        (i)    Lessee will deliver to Lessor written notice of the occurrence of any Event of Loss with respect to the Aircraft within five (5) days after the occurrence thereof.  On the next Basic Rent Date following the earlier to occur of (1) the date which is sixty (60) days after such Event of Loss and (2) the date on which Lessor or Lessee receives the insurance proceeds, with respect to such Event of Loss (or, if the Event of Loss occurs after the Last Basic Rent Date, within thirty (30) days after the Event of Loss), Lessee will pay to Lessor an amount equal to the sum of (A) all Rent then due hereunder, plus (B) the Casualty Value of the Aircraft determined as of such next Basic Rent Date or the Last Basic Rent Date, as applicable.  Upon Lessor's receipt of such amounts, Lessee's obligation to pay further Basic Rent for the Aircraft will cease, but Lessee's obligation to pay Supplemental Rent and any other amounts due under this Lease, if any, will remain in full force and effect.  Except in the case of total destruction, permanent disappearance, Requisition of Use, or Return to Manufacturer, Lessor will be entitled to possession of the Aircraft, unless possession by an insurance carrier is required in order to settle an insurance claim.  Lessor will be entitled to any salvage value in excess of the Casualty Value paid to Lessor.  Lessor will be under no duty to Lessee to pursue any claim against any Person in connection with an Event of Loss, but Lessee may at its sole cost and expense and with Lessor's prior written consent pursue the same on behalf of Lessor in such manner as may be reasonably acceptable to Lessor.

        (ii)    Following payment to Lessor of the Casualty Value, Lessee will dispose of the Aircraft as Lessor's agent as soon as it is able for the best price obtainable.  Any such disposition will be on an "AS-IS, WHERE-IS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY (OTHER THAN AS TO LESSOR'S LIENS) BY, OR RECOURSE TO, LESSOR of any kind whatsoever.  Lessee may retain all amounts received from such disposition up to an amount equal to the sum of the Casualty Value actually paid by Lessee plus Lessee's reasonable costs and expenses of disposition.  Any excess will be paid over to, and retained by, Lessor.  In the event of a Return to Manufacturer, Lessee will be entitled to all amounts payable to Lessor by the Manufacturer up to the amount, if any, of the Casualty Value actually paid by Lessee to Lessor, and any excess will be retained by Lessor.  With respect to a Requisition of Use, Lessee will be entitled to all amounts paid by any governmental authority up to the Casualty Value actually paid by Lessee, and any excess will be paid over to, and retained by, Lessor.

    (b)    <u>Event of Loss With Respect to an Engine</u>.  Upon an Event of Loss with respect to any Engine under circumstances in which there has not occurred an Event of Loss with respect to the Airframe upon which such Engine was installed, Lessee will give Lessor prompt written notice thereof and will, within thirty (30) days after the occurrence of such Event of Loss, convey to Lessor title to an engine that is (i) the same make and model number as the Engine suffering the Event of Loss, (ii) free and clear of all Liens, (iii) of a value, utility, and useful life at least equal to, and be in as good an operating condition as, the Engine suffering the Event of Loss, assuming such Engine was of the value and utility and in the condition and repair required by the terms hereof immediately prior to the occurrence of such Event of Loss.  Lessee, at its sole cost and expense, will furnish Lessor with such documents to evidence the conveyance as Lessor requests.  Upon full compliance by Lessee with the terms of this paragraph, Lessor will transfer to Lessee, without recourse, representation or warranty of any kind whatsoever, other than as to Lessor's Liens, all of Lessor's right, title and interest, if any, in and to the Engine suffering the Event of Loss.  SUCH TRANSFER WILL BE ON AN "AS-IS, WHERE-IS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY (OTHER THAN AS TO LESSOR'S LIENS) BY, OR RECOURSE TO, LESSOR AS TO THE ENGINE SO TRANSFERRED TO LESSEE.  Each replacement engine will, after such conveyance, be deemed an "Engine" as defined herein and will be deemed part of the same Aircraft as was the replaced Engine.  In connection with any replacement of an Engine pursuant to this Section 13(b) Lessee will enter into a supplement to this Lease identifying the replacement engine, subjecting such engine to this Lease and providing for an International Interest in favor of Lessor and Lessee shall effect the registration of such International Interest and the bill of sale transferring title in such replacement engine to Lessor with the International Registry, and take such other action and make such filings as reasonably requested by Lessor to register, protect, preserve and perfect its interests in and relating to such replacement engine.  No Event of Loss with respect to an Engine will result in any reduction or delay in the payment of Basic Rent or relieve Lessee of any obligation under this Lease.

(c)     Risk of Loss, No Release of Obligations.   Lessee will bear the entire risk of loss, theft, confiscation, expropriation, requisition, damage to or destruction of the Aircraft and will not be released from its obligations hereunder in the event of any damage to the Aircraft or any part thereof or any Event of Loss relating thereto, until such time as all obligations hereunder have been performed in full.

**SECTION 14.   Insurance.**

(a)     Insurance.   Without limitation of any insurance specified in the Insurance Requirements Letter required to be maintained by Lessee with respect to the Aircraft, Lessee, at its sole cost and expense, will maintain or cause to be maintained:

(i)     aircraft liability insurance with respect to third party bodily injury and property damage (including without limitation contractual liability, cargo liability, war risk (including government confiscation, hijacking and other acts of terrorism) passenger legal liability and property damage coverage) covering claims arising from the use or operation of the Aircraft in or over any area in an amount not less than the greater of (a) $25,000,000 per occurrence or $2,500,000 per seat per occurrence, or such higher amounts as are required by law in the geographic location or country in or over which the Aircraft is flown, operated or located and (b) the amounts of aircraft liability insurance from time to time applicable to aircraft operated by Lessee (whether owned or leased) of the type of the Aircraft;

(ii)     cargo liability insurance sufficient to cover the maximum value of cargo on the Aircraft at any one time if Lessee is engaged in transporting property of others;

(iii)     all-risk aircraft physical damage insurance covering the Aircraft in motion and not in motion, in flight and on the ground, and the Engine and all Parts while attached to or removed from the Airframe, including foreign object damage whether resulting from ingestion or otherwise, in an amount not less than the lesser of the full replacement value of the Aircraft or the then Casualty Value;

(iv)     for all locations which the Aircraft travels to and through: war and allied perils insurance to cover the perils of (A) war, invasion, acts of foreign enemies, hostilities (whether war be declared or not), civil war, rebellion, revolution, insurrection, martial law, military or usurped power or attempts at usurpation of power, (B) strikes, riots, civil commotions of labor disturbances, (C) any act of one or more persons, whether or not agents of a sovereign power, for political or terrorist purposes and whether the loss or damage resulting therefrom is accidental or intentional, (D) any vandalism, malicious act or act of sabotage, (E) confiscation, naturalization, seizure, restraint, detention, diversion, appropriation, requisition for title or use by or under the order of any government (whether civil, military or de facto) or public or local authority and (F) hijacking, or any unlawful seizure or wrongful exercise of control of the crew in flight; and

(v)     such other insurance against such other risks as is usually carried by similar companies owning or leasing and operating aircraft similar to the Aircraft. All such insurance will be maintained with insurers of recognized reputation and responsibility (reasonably satisfactory to Lessor) having a rating not less than A- from A.M. Best, or other rating approved by Lessor. All insurance policies will be in a form acceptable to Lessor.

If Lessee fails to maintain insurance as herein provided, Lessor may, at its option, provide such insurance, and Lessee will, upon demand, reimburse Lessor for the cost thereof.

(b)     Requirements.   All insurance policies required hereunder will:  (i) require 30 days' prior written notice to Lessor of cancellation, non-renewal or material change in coverage (any such cancellation, non-renewal or change, as applicable, not being effective until the thirtieth (30th) day after the giving of such notice) except, in the case of cancellation for non-payment of premium, only 10 days' prior written notice shall be required and in the case of cancellation of the coverages described under Section 14(a)(iv), notice as established under the applicable endorsements; (ii) name the Additional Insureds (as hereinafter defined) as an additional insured under the liability coverage and name Additional Insureds as sole loss payee under the physical damage insurance coverage; (iii) not require contributions from other policies held by the Additional Insureds; (iv) waive any right of subrogation against

the Additional Insureds; (v) in respect of any liability of any of the Additional Insureds, except for the insurers' salvage rights in the event of a loss or damage, waive the right of such insurers to setoff, to counterclaim or to any other deduction, whether by attachment or otherwise, to the extent of any monies due the Additional Insureds under such policies; (vi) permit but not require that any of the Additional Insureds pay or be liable for any premiums with respect to such insurance covered thereby; (vii) provide for coverage in all areas in which the Aircraft is permitted to fly under the terms hereof; (viii) provide that all of the provisions thereof, except the limits of liability, will operate in the same manner as if there were a separate policy covering each Additional Insured; and (ix) contain breach of warranty provisions providing that, in respect of the interests of the Additional Insureds in such policies, the insurance will not be invalidated by any action or inaction of Lessee or any other person (other than an Additional Insured, as to itself only) and will insure the Additional Insureds regardless of any breach or violation of any warranty, declaration or condition contained in such policies by Lessee or by any other person (other than an Additional Insured, as to itself only).  As used herein, the term "<u>Additional Insureds</u>" means Lessor and its successors and/or assigns.

(c)    <u>No Right to Self-insure</u>.  Lessee will not self-insure (by deductible, premium adjustment, or risk retention arrangement of any kind) the insurance required to be maintained hereunder, except to the extent of deductibles usually and customarily maintained by companies engaged in the same or similar business as Lessee and operating the same or similar aircraft and approved by Lessor.

(d)    <u>Notice of Loss or Damage; Application of Proceeds</u>.  Lessee will give Lessor prompt notice of any damage to or loss of, the Aircraft, or any part thereof.  Insurance proceeds for partial loss or damage to the Aircraft or any part thereof will be applied as Lessor in its sole discretion determines.

(e)    <u>Reports, Policies, Certificates</u>.  Not less than fifteen (15) days prior to the expiration dates of the policies obtained by Lessee pursuant to this section, Lessee will deliver to the Additional Insureds certificate(s) of insurance evidencing that the coverage required hereunder has been obtained beyond such expiration date, together with a certificate certifying that such insurance complies with the terms hereof, accompanied, if requested by Lessor, by the applicable policies and report(s) of insurance broker(s) or underwriter(s) as to the conformity of such coverage with such requirements; *provided, however*, that the Additional Insureds will be under no duty either to ascertain the existence of or to examine any certificates or reports or to advise Lessee if such insurance does not comply with the requirements of this section.

(f)    <u>Attorney-in Fact</u>.  Lessee irrevocably appoints Lessor (and any assignee, mortgagee and/or lender of Lessor) its attorney-in-fact to file, settle, or adjust, and receive payment of, claims under any insurance policy required hereby and to endorse Lessee's name on any checks, drafts or other instruments in payment of such claims, and to otherwise act in Lessee's name and on its behalf to make, execute, deliver and file any instruments or documents necessary in connection therewith, and to take any action as Lessor (and any such assignee, mortgagee and/or lender) deems necessary or appropriate to obtain the benefits intended to inure to Lessor under this Section 14.  To the extent appropriate or permissible under applicable law, such appointment is coupled with an interest, is irrevocable, and will terminate only upon payment in full of the obligations set forth in this Lease and/or any agreements, documents or instruments related thereto.  Notwithstanding the foregoing, unless a Default or Event of Default has occurred and is continuing hereunder, Lessor agrees that it will not exercise its powers as attorney in fact with respect to claims for damages in amounts payable under such policies of insurance which are less than the lesser of (i) $100,000.00, or (ii) ten percent (10%) of Lessor's Cost if Lessor's Cost is under one million dollars ($1,000.000).

**SECTION 15.   Indemnification.**   Lessee will indemnify and hold harmless Lessor and each Lessor Assignee, on an after tax basis, from and against any and all liabilities, causes of action, claims, suits, penalties, damages, losses, costs or expenses (including attorneys' fees), obligations, demands and judgments (collectively, a "<u>Liability</u>") arising out of or in any way related to: (i) Lessee's failure to perform any covenant under the Lease or any other agreement, contract, document or instrument executed or delivered by Lessee or any Guarantor in connection with the Lease (the "<u>Lease Documents</u>"), (ii) the untruth of any representation or warranty made by Lessee under the Lease Documents, (iii) the order, manufacture, purchase, ownership, selection, acceptance, rejection, possession, rental, sublease, operation, use, maintenance, control, loss, damage, destruction, removal, storage, surrender, sale, condition, delivery, return or other disposition of or any other matter relating to the Aircraft, or (iv) injury to persons, property or the environment including any Liability based on strict liability in tort, negligence, breach of warranties or Lessee's failure to

comply fully with applicable law or regulatory requirements; *provided*, that the foregoing indemnity will not extend to any Liability to the extent resulting solely from the gross negligence or willful misconduct of Lessor. In addition, and not in limitation of the foregoing, Lessee shall pay any civil penalty or fine assessed by the Office of Foreign Assets Control against Lessor or any affiliate of Lessor, and all reasonable costs and expenses (including attorneys' fees and disbursements) incurred in connection with defense thereof, as a result of the funding of the Lease or the acceptance of payments due thereunder. All of Lessor's rights, privileges and indemnities contained in this Section 15 shall survive the expiration or other termination of the Lease. The rights, privileges and indemnities contained herein are expressly made for the benefit of, and shall be enforceable by Lessor, its successors and assigns.

**SECTION 16.    Assignment and Sublease.**

(a)    By Lessee.  LESSEE WILL NOT SELL, TRANSFER, ASSIGN, CHARTER, SUBLEASE, CONVEY, PLEDGE, MORTGAGE OR OTHERWISE ENCUMBER ITS INTEREST IN, UNDER, OR TO THE LEASE OR THE AIRCRAFT, AND ANY SUCH SALE, TRANSFER, ASSIGNMENT, CHARTER, SUBLEASE, CONVEYANCE, PLEDGE, MORTGAGE OR ENCUMBRANCE, WHETHER BY OPERATION OF LAW OR OTHERWISE, WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR WILL BE NULL AND VOID.  IN ADDITION, LESSEE WILL NOT ENTER INTO ANY INTERCHANGE AGREEMENT WITH RESPECT TO THE AIRCRAFT OR RELINQUISH POSSESSION OF THE AIRCRAFT OR ANY ENGINE, OR INSTALL ANY ENGINE OR PART, OR PERMIT ANY ENGINE OR PART TO BE INSTALLED, ON ANY AIRFRAME OTHER THAN THE AIRFRAME LEASED HEREUNDER EXCEPT AS EXPRESSLY SET FORTH HEREIN OR CONSENT TO, CREATE OR PROVIDE FOR AN INTERNATIONAL INTEREST, PROSPECTIVE INTERNATIONAL INTEREST OR PROSPECTIVE SALE IN OR RELATING TO THE AIRCRAFT OR ANY CHARTER OR SUBLEASE THEREOF WITHOUT THE PRIOR WRITTEN CONSENT OF LESSOR.  No acceptance, assignment, subletting, relinquishment or installation will in any event relieve Lessee of primary, absolute and unconditional liability for its duties and obligations under this Lease.

(b)    By Lessor.  Lessor, at any time with or without notice to Lessee, may sell, transfer, assign and/or grant a security interest in all or any part of Lessor's interest in this Lease or the Aircraft or any part thereof (each, a "Lessor Transfer") and Lessee hereby expressly consents in advance to any such assignment by Lessor of this Lease, including Lessor's International Interest and any associated rights in the Aircraft. Any purchaser, transferee, assignee or secured party of Lessor (each a "Lessor Assignee") will have and may exercise all of Lessor's rights hereunder with respect to the items to which any such Lessor Transfer relates, and Lessee will not assert against any Lessor Assignee any claim Lessee may have against Lessor, provided Lessee may assert any such claim in a separate action against Lessor. Upon receipt of written notice of a Lessor Transfer, Lessee will promptly acknowledge in writing its obligations under the Lease, will comply with the written directions or demands of any Lessor Assignee and will make all payments due under the assigned Lease as directed in writing by Lessor Assignee. Following such Lessor Transfer, the term "Lessor" will be deemed to include or refer to each Lessor Assignee. Lessee will provide reasonable assistance to Lessor to complete any transaction contemplated by this subsection (b).

(c)    Successors.  Subject to the restriction on assignment contained in subsection (a), the Lease will inure to the benefit of, and is binding upon, the successors and assigns of the parties hereto.

**SECTION 17.    Tax Indemnification.**

(See Special Tax Indemnity Addendum attached hereto as Exhibit C)

**SECTION 18.    Events of Default.**

(a)    The term "Event of Default," wherever used herein, means any of the following events or circumstances (whatever the reason for such Event of Default and whether it be voluntary, involuntary, occur by operation of law, or occur pursuant to or as a result of actions in compliance with any judgment, decree or order of any court or any order, rule or regulation of any administrative or governmental body):

(i)    Lessee fails to pay any Rent or any other amount due hereunder within three (3) days after the same has become due; or

(ii)    Lessee fails to keep in full force and effect any of the insurance required under Section 14 of this Lease, or operates the Aircraft at a time when, or at a place in which, such insurance is not in effect; or

(iii)    Lessee fails to perform or observe any other covenant, condition or agreement required to be performed or observed by it hereunder or under any agreement, document or certificate related hereto; provided if such Default is capable of cure within thirty (30) days of Lessee's knowledge of such Default, Lessee shall have a period of thirty (30) days to cure such Default (but not beyond the expiration of the Term) after the earlier of (i) actual knowledge by Lessee, or (ii) written notice thereof from Lessor to Lessee; or

(iv)    Lessee defaults beyond any applicable grace or cure periods in the payment or performance of any other obligation to Lessor or any affiliated Person controlling, controlled by or under common control with Lessor; or

(v)    any representation or warranty now or hereafter made or information now or hereafter provided by Lessee, including any financial information, proves to be or to have been false, inaccurate, or misleading in any material respect; or

(vi)    the commencement of any bankruptcy, insolvency, arrangement, reorganization, receivership, liquidation or other similar proceeding by or against Lessee or any of its properties or businesses (which, in the case of a proceeding commenced against Lessee, has not been dismissed within sixty (60) days of the filing thereof), the appointment of a trustee, receiver, liquidator or custodian for Lessee or any of its properties or businesses, or the making by Lessee of a general assignment or deed of trust for the benefit of creditors; or

(vii)    Lessee defaults in any obligation to a third party, as a result of which such third party has the right to accelerate Lessee's obligations to such third party; or

(viii)    there shall be a default under, or repudiation of, the guaranty agreement between any Guarantor and Lessor; or

(ix)    the occurrence of any of the following (each, a "Prohibited Transfer"): (i) a merger, consolidation or other corporate reorganization or change in the identity of Lessee or any Guarantor, (ii) a sale, lease, transfer or other disposition, whether or not in a taxable transaction, of (a) all or a substantial portion of the assets of Lessee or any Guarantor, or (b) an operation, line of business, division, or subsidiary that represents more than a substantial portion of the consolidated revenues of Lessee or any Guarantor, with substantial portion meaning, in either case, greater than twenty percent (20%) or (iii) (A) if Lessee or any Guarantor is a private company, the owners of the capital stock or other units of ownership of Lessee or any Guarantor on the date of this Lease entitled to vote for the election of the board of directors of Lessee or any Guarantor, as applicable or other similar governing body cease to own or do not have the unencumbered right to vote in the aggregate at least ninety percent (90%) of such capital stock or other ownership interest of Lessee or any Guarantor, as applicable and (B) if Lessee or any Guarantor is a public company and as a result of or in connection with a material change in ownership of Lessee's or any Guarantor's capital stock, Lessee's or any Guarantor's Total Liabilities to Tangible Net Worth ratio equals or exceeds twice the ratio of Lessee's or any Guarantor's Total Liabilities to Tangible Net Worth ratio as of the date of this Lease. An Event of Default shall also be deemed to have occurred if a Prohibited Transfer occurs with respect to any fifty percent (50%) or greater owner of Lessee (or Lessee's permitted assignee in the event of any assignment) or any Guarantor; or

(x)    Lessee, if an individual, dies or, if a legal entity, is dissolved; or

(xi)    Lessee becomes insolvent or generally fails to pay its debts as they became due or Lessee admits in writing its inability to pay its debts or obligations generally as they become due; or

(xii)    Lessor determines, in its sole discretion and in good faith, that Material Adverse Change has occurred; or

(xiii)    the making of any levy, seizure, or attachment on or of the Aircraft which is not removed within ten (10) days; or

(xiv)    any attempt to terminate, revoke, rescind, modify, or violate the terms of this Lease, any Guaranty, or any other Purchase Document without the prior written consent of Lessor; or

(xv)    any event or condition set forth in subsections iv through xiii of this Section 18 occurs with respect to any Guarantor or other Person responsible, in whole or in part, for payment or performance of Lessee's obligations under this Lease;

(xvi)    any event or condition set forth in subsections iv through xiii of this Section 18 occurs with respect to any affiliated Person, or any Person controlling, controlled by or under common control with Lessee; or

(xvii)    Lessee has not irrevocably and unconditionally accepted the Aircraft for lease under the Lease on or before December 1, 2008.

(b)    Lessee will promptly notify Lessor of the occurrence of any Default or Event of Default.

## SECTION 19.   Remedies.

(a)    Upon the occurrence of any Event of Default, Lessor may exercise any one or more of the following remedies, as Lessor in its sole discretion elects:

(i)    Proceed by appropriate court action, either at law or in equity, to enforce performance by Lessee of this Lease or to recover damages for the breach hereof.

(ii)    By notice to Lessee, terminate this Lease, whereupon all rights of Lessee to the use of the Aircraft or any part thereof will absolutely cease and terminate but Lessee will remain liable as hereinafter provided.

(iii)    Cause Lessee, at its expense to promptly to return the Aircraft to Lessor at such place as Lessor designates.

(iv)    Enter upon any premises where the Aircraft is located and, without notice to Lessee, take immediate possession of and remove the same, together with any Engines and Parts, by self-help, summary proceedings or otherwise without any liability of any kind whatsoever on the part of Lessor for or by reason of such entry or taking of possession, and without such action constituting a cancellation or termination of the Lease unless Lessor notifies Lessee in writing to such effect.

(v)    By written notice to Lessee specifying a payment date (the "Remedy Date"), demand that Lessee pay to Lessor, and Lessee will forthwith pay to Lessor on the Remedy Date, an amount equal to the sum of (i) any unpaid Rent due and payable for all periods up to and including the Remedy Date, plus, (ii) as liquidated damages for loss of a bargain and not as a penalty, an amount equal to the Casualty Value of the Aircraft, computed as of the Remedy Date, plus (iii) all costs, charges and expenses including reasonable legal fees and disbursements incurred by Lessor by reason of the occurrence of any Event of Default or the exercise of any of Lessor's remedies with respect thereto or otherwise.

(vi)    Sell or otherwise dispose of the Aircraft by public or private sale, with or without notice to Lessee, and without having the Aircraft present at the place of sale and in such manner as it deems appropriate. Lessor may elect to purchase the Aircraft at such sale for a price not less than the highest bona fide bid given by a Person unrelated to Lessee. Lessee waives all of its rights under laws governing such sale to the extent permitted by law. Lessee hereby agrees that ten working days' prior notice to Lessee of any

public sale or of the time after which a private sale may be negotiated will be conclusively deemed commercially reasonable notice.

(vii)    Hold, keep idle, lease, or use or operate all or part of the Aircraft without any liability whatsoever and store the Aircraft on Lessee's premises pending lease or sale or hold a sale on such premises without liability for rent or costs whatsoever.

(viii)    Exercise any other right or remedy available to Lessor under applicable law, including any applicable rights and remedies specified under the Cape Town Treaty available to Lessor. In addition, Lessee will be liable for all reasonable costs, expenses, and legal fees incurred in enforcing Lessor's rights under the Lease, before or in connection with litigation and for any deficiency in the disposition of the Aircraft.

(b)    The net proceeds of any sale or lease as provided above will be applied by Lessor (i) first, to pay all costs, charges and expenses incurred in enforcing its rights hereunder, including the cost of discharging all Liens on the Aircraft and all reasonable legal fees and disbursements incurred by Lessor as a result of the Event of Default and/or the exercise of its remedies with respect thereto, (ii) second, to pay to Lessor an amount equal to any unpaid Rent due and payable and the Casualty Value, to the extent not previously paid, and (iii) third, to reimburse Lessee for the Casualty Value to the extent paid by Lessee as liquidated damages. Any surplus remaining thereafter will be retained by Lessor.

(c)    Lessee hereby waives, to the maximum extent now or hereafter permitted by applicable law, for itself and for its successors or assigns and all rights Lessee or Lessee's successors or assigns may have following an Event of Default under any bankruptcy, insolvency or similar laws, rules or regulations with respect to the continued possession or use of the Aircraft or relief from the payment of Rent therefor or otherwise with respect to this Lease. Rejection of this Lease by any bankruptcy trustee or debtor-in-possession will entitle Lessor to the immediate return of the Aircraft and to liquidated damages calculated in the manner provided for in Section 19(v) above.

(d)    No right or remedy referred to herein is intended to be exclusive, but each will be cumulative and in addition to any other right or remedy referred to above or otherwise available to Lessor at law or in equity, including such rights and/or remedies as are provided for in the UCC and the Cape Town Treaty. No express or implied waiver by Lessor of any Default or Event of Default hereunder will in any way be, or be construed as, a waiver of any future or subsequent Default or Event of Default. The failure or delay of Lessor in exercising any rights granted it hereunder upon the occurrence of any of the contingencies set forth herein will not constitute a waiver of any such right upon the continuation or reoccurrence of any such contingencies or similar contingencies, and any single or partial exercise of any particular right by Lessor will not exhaust the same or constitute a waiver of any other right provided for or otherwise referred to herein.

(e)    With respect to any exercise by Lessor of its right to recover and/or dispose of the Aircraft, Lessee acknowledges and agrees that Lessor may dispose of the Aircraft on an "AS-IS, WHERE-IS" basis, in compliance with applicable law and with such preparation (if any) as Lessor determines to be commercially reasonable. Lessee will remain liable for any deficiency in the disposition of the Aircraft.

(f)    To the extent permitted by applicable law, Lessee hereby waives any rights now or hereafter conferred by statute, treaty or otherwise which may require Lessor to sell, lease or otherwise use the Aircraft in mitigation of Lessor's damages as set forth in this Section 19 or which may otherwise limit or modify any of Lessor's rights or remedies under this Section 19. To the extent permitted by applicable law, Lessee waives any and all rights and remedies conferred upon a lessee by Section 2A-508 to 2A-522 (inclusive) of the UCC, including any rights of Lessee (i) to cancel or repudiate this Lease or any supplement or any document relating thereto, (ii) to reject or revoke acceptance of the Aircraft or any component thereof and (iii) to recover from Lessor any general or consequential damages, for any reason whatsoever.

**SECTION 20.    <u>Performance of Obligations of Lessee by Lessor.</u>**

If Lessee fails to perform or comply with any of its obligations contained herein, Lessor will have the right, but will not be obligated, to effect such performance or compliance and Lessee will remit to Lessor promptly upon

demand therefor the amount expended by Lessor in effecting such performance or compliance plus any out-of-pocket expenses incurred by Lessor in connection therewith. Any such action by Lessor will not be deemed a cure or waiver of any of Lessee's obligations hereunder or of any Default or Event of Default.

**SECTION 21.   Intent.**

(a)      General. This Lease is intended to be a true lease and not a sale of the Aircraft. Title to the Aircraft will at all times remain in Lessor, and the parties agree that this Lease is a "Finance Lease" as defined in the UCC. Lessee represents that Lessee: (i) has selected the supplier and directed Lessor to purchase the Aircraft from the supplier in connection with this Lease, (ii) has been informed in writing in this Lease, before Lessee's execution of this Lease, that Lessee is entitled under UCC Article 2A to the promises and warranties provided to Lessor by the supplier in connection with or as part of the Purchase Agreement, including those of any third party, and (iii) understands that it may communicate with the supplier and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

(b)      Security Interest. Should a court of competent jurisdiction determine that this agreement is not a true lease, but rather one intended as security, then solely in that event and for the expressly limited purposes thereof. With respect to any interest in the Aircraft (and the other property identified in clauses (i) through (iv) below) held by Lessee (whether now existing or hereafter acquired), Lessee hereby grants to Lessor for itself and as agent on behalf of the Lessor Affiliates a first priority perfected security interest and creates an International Interest in favor of Lessor and Lessor Affiliates (including all associated rights with respect thereto) in and to (i) the Aircraft and all replacements, substitutions, improvements and accessions thereof and all logs, manuals, warranties and other documents and certificates relating to the Aircraft; (ii) all data and records regarding inspections, modifications, operation, engineering and overhaul of the Aircraft or otherwise relating to the Aircraft; (iii) all estate, right, title and interest of the Lessee in, to and under (1) the Lease, as it may be from time to time supplemented or amended, including, any sublease, or assignment or transfer including all Lessee's rights to receive rent, insurance payments and other payments thereunder and all other performance thereunder and any guarantee and other securities relating to any sublease, any purchase agreement, any maintenance contracts or service plans and bills of sale, (2) all amounts of Rent, insurance proceeds and requisition, indemnity or other payments of any kind for or with respect to the Aircraft or the Lease, (3) all moneys and claims for moneys due and to become due to the Lessee under or with respect to the Lease, and all claims for damages with respect to the Lease, (4) all amounts payable in accordance with the Lease in respect of any Event of Loss with respect to the Aircraft, and (5) all other payments of any kind for or with respect to the Aircraft; and (iv) all proceeds of the foregoing as collateral security for the payment and performance by Lessee of Lessee's obligations under the Lease and the obligations of Lessee or any Lessee Affiliate, including under any swap agreement (as defined in 11 U.S.C. §101), owing to Lessor or any Lessor Affiliate.

**SECTION 22.   Notices.**

All notices made or required to be given pursuant to the Lease shall be in writing and shall be deemed duly served on the 3rd Business Day if and when mailed, certified or registered mail, postage prepaid, return receipt requested, or the next Business Day when delivered to a reputable overnight courier for next Business Day delivery, to the other party at its address set forth above or at such other address as such party shall hereafter designate in writing.

**SECTION 23.   Purchase and Renewal Options.**

(a)      Purchase Option.  So long as (i) no Default or Event of Default shall have occurred and be continuing under this Lease and (ii) this Lease has not been earlier terminated, Lessee will be entitled, at its option, upon written notice to Lessor at least one hundred eighty (180) days prior to the expiration of the Basic Term, to purchase all but not less than all of the Aircraft at the expiration of the Basic Term for an amount, payable in immediately available funds, equal to the fair market sales value of the Aircraft as of the end of the Basic Term determined in accordance with Section 23(c) hereof, plus any applicable sales, excise or other taxes imposed as a result of such sale (other than gross or net income taxes on Lessor's income attributable to such sale) and together with all Rent and all other amounts then due and owing.  Lessor's sale of the Aircraft will be on an "AS-IS, WHERE-IS" BASIS WITHOUT ANY REPRESENTATION OR WARRANTY (OTHER THAN AS TO NO LESSOR'S LIENS) BY, OR RECOURSE TO, LESSOR.

(b)     Renewal Option.   So long as (i) no Default or Event of Default shall have occurred and be continuing under this Lease, (ii) Lessee shall not have exercised its purchase option pursuant to Section 23(a) hereof and (iii) the Lease shall not have been earlier terminated or cancelled, Lessee shall be entitled, at its option, to extend the Term of this Lease with respect to the Aircraft at the expiration of the Basic Term for an additional period.  The length of such additional period shall be determined by mutual agreement of Lessee and Lessor (such additional period being hereinafter referred to as the "Renewal Term").  A Renewal Term will commence at the expiration of the Basic Term.  Lessee's option to renew the Lease for the Renewal Term shall be exercisable by giving written notice to Lessor at least one hundred eighty days prior to the expiration of the Basic Term with respect to all but not less than all of the Aircraft for a Renewal Term selected by Lessee of not less than one (1) year that, in any event, will permit such Aircraft to have an estimated remaining useful (determined at or about the date of Lessee's election) of at least 15% of its estimated total useful life at the end of such Renewal Term or as otherwise agreed by Lessor and Lessee.  All of the provisions of this Lease will be applicable during the Renewal Term, except that, during the Renewal Term, the Basic Rent will be an amount equal to the Aircraft's fair rental value, which will be determined in accordance with Section 23(c) hereof.  Such Basic Rent will be payable monthly, in advance or arrears, and on the same day of each month during the Renewal Term as, in each case, was applicable during the Basic Term.  Such payment dates will be "Basic Rent Dates."

(c)     Determination of Fair Market Sales and Rental Values.   If Lessee has elected to exercise its purchase or renewal options, as provided in 23(a) or (b) hereof, then as soon as practicable following Lessor's receipt of the written notice from Lessee of Lessee's intent to exercise such option, Lessor and Lessee will consult for the purpose of determining the fair market sales value or fair market rental value, as applicable, (as defined below) of the Aircraft as of the end of the Basic Term, and any values agreed upon in writing will constitute such fair market sales value or fair market rental value, as the case may be, of the Aircraft for the purposes of this Section 23.  If Lessor and Lessee fail to agree upon such value before the expiration of the Basic Term, Lessor will appoint an independent appraiser (reasonably acceptable to Lessee) to determine fair market sales value or fair market rental value, as the case may be, and that determination will be final, binding and conclusive.  Lessee agrees to pay the costs and expenses of any such appraisal.  For the purposes of this 23, "fair market sales value" and "fair market rental value" will be determined on the basis of, and will equal in value, the amount that would be obtained in an arm's length transaction between an informed and willing buyer-user or lessee, as the case may be (who is neither a lessee in possession nor a used equipment dealer) and an informed and willing seller or lessor, as the case may be, under no compulsion to sell or lease, as the case may be, and in such determination costs of removal of the Aircraft from its then location will not be a deduction from such fair market sales value or fair market rental value, as the case may be, and it will be assumed (whether or not the same be true) that (i) the Aircraft has been maintained in accordance with the provisions of this Lease, (ii) the Aircraft would have been returned to Lessor in compliance with the requirements of Section 8 hereof or any other applicable section, and (iii) that the total number of Airframe hours (including any component with hourly overhaul schedules) accumulated from the Acceptance Date to the Expiration Date or other date of termination or cancellation do not exceed the product of Estimated Annual Hours times the number of twelve month periods and any portion thereof, from the Acceptance Date to such expiration, termination, or cancellation date (any such excess, the "Excess Hours").

(d)     Time to Exercise Option.   Lessee will be deemed to have waived the purchase option under Section 23(a) and the renewal option under Section 23(b) and the early purchase option under Section 23(e), unless, in each case, Lessee provides Lessor with written notice of its irrevocable election to exercise the applicable option within the time period specified in each such section.

(e)     Early Purchase Option.   So long as no Default or Event of Default shall have occurred and be continuing hereunder, Lessee shall be entitled, at its option, on the Basic Rent Dates occurring on each of the 36th and 60th months of the Basic Term (any such date for purposes of this Section, called the "Early Purchase Date") upon written notice to Lessor of at least one hundred twenty (120) but no more than one hundred eighty (180) days prior to the proposed Early Purchase Date, to purchase the Aircraft.  Such early purchase by Lessee shall be effective upon the payment to the Lessor on the Early Purchase Date of an amount equal to the applicable Early Purchase Option Amount.

On the Early Purchase Date, in addition to the Early Purchase Option Amount, Lessee shall also pay to Lessor, in immediately available funds, (i) the Basic Rent due for the Aircraft on the Early Purchase Date, plus (ii) all accrued and unpaid Rent then due and owing for the Aircraft.

On the Early Purchase Date (but in no event prior to Lessor's receipt of the amounts specified in this Section), Lessor shall sell the Aircraft to Lessee on an "AS-IS, WHERE-IS" BASIS, WITHOUT ANY REPRESENTATION BY, OR RECOURSE OR WARRANTY, EITHER EXPRESS OR IMPLIED, TO, LESSOR. Upon receipt of the amounts specified in the foregoing paragraph and upon consummation of the sale of the Aircraft, this Lease shall be deemed terminated.

Unless and until the foregoing payments and performance have been made and/or observed in full by Lessee, Lessee's obligations under this Lease, including, without limitation, the obligation to pay Basic Rent for the Aircraft, shall continue in full force and effect.

Notwithstanding anything to the contrary contained herein or otherwise, Lessee shall not be entitled to purchase the Aircraft pursuant to this Section if an Event of Default or Default shall have occurred and be continuing, this Lease shall have been earlier terminated and/or the Aircraft shall have been purchased on or prior to the proposed Early Purchase Date.

**SECTION 24.   Transaction Expenses.**

Lessee will pay all actual and reasonable fees, costs and expenses incurred by Lessor in connection with this Lease, whether or not the transactions contemplated hereby are consummated, including appraisal fees, Lessor's counsel fees and expenses and FAA Counsel fees and expenses, and FAA, International Registry and UCC title and lien searches, reports, filing, discharge, registration and recording fees, charges and taxes. Lessee also agrees to pay all fees and expenses of Lessor's counsel, FAA Counsel and all other third parties who are engaged by Lessor to enforce Lessor's rights and/or remedies hereunder, to update any FAA or UCC title and/or lien reports and/or to review, file, register, discharge and record any and all documents and instruments as required by Lessor, the Cape Town Treaty, the International Registry or the FAA during and after the Term of this Lease.

**SECTION 25.   Miscellaneous.**

(a)     All agreements, indemnities, representations, covenants and warranties contained in this Lease or any agreement, document or certificate delivered pursuant hereto or thereto or in connection herewith or therewith will survive the execution and delivery of this Lease and the expiration or other termination of this Lease for any reason whatsoever.

(b)     Any provision of this Lease that is prohibited or unenforceable will be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions thereof.

(c)     This Lease, and each related instrument, document, agreement and certificate, collectively constitute, and are intended to collectively constitute, the complete and exclusive statement of the terms of the agreement between Lessor and Lessee with respect to the purchase and leasing of the Aircraft and cancel and supersede any and all prior or contemporaneous oral or written understandings, memoranda, negotiations, communications and agreements with respect thereto including any proposal letter, commitment letter and/or term sheet delivered to Lessee by Lessor.

(d)     This Lease may be executed in several counterparts and by different parties hereto on separate counterparts, each of which when so executed or otherwise authenticated and delivered will be an original, but all such counterparts will together consist of one and the same instrument; except, to the extent that the Lease constitutes chattel paper under the UCC, no security interest therein may be created other than through the transfer or possession of the original counterpart, which will be identified by Lessor. If this Lease is executed by more than one person or entity as Lessee, the obligations of all such signers hereunder will be joint and several and all references to "Lessee" will apply both jointly and severally. The Lease will be binding upon Lessor only if executed by a duly authorized officer or representative of Lessor at Lessor's address set forth above. An authorized signer of Lessee will execute the Lease Documents on Lessee's behalf.

(e)     The division of this Lease into sections, the provision of a table of contents and the insertion of headings are for convenience of reference only and will not affect the construction or interpretation of this Lease.

(f)     LESSEE HEREBY AUTHORIZES LESSOR TO AUTHENTICATE AND/OR FILE ALL UCC FINANCING STATEMENTS AND AMENDMENTS THAT IN LESSOR'S SOLE DISCRETION ARE DEEMED NECESSARY OR PROPER TO SECURE OR PROTECT LESSOR'S INTEREST IN THE AIRCRAFT OR ANY PART THEREOF IN ALL APPLICABLE JURISDICTIONS.  Lessee hereby consents to the registration of the International Interests in the Airframe and Engines provided for by (or created under) this Lease (including under Section 13(b) hereof) with the International Registry.  Lessee hereby ratifies, to the extent permitted by law, all that Lessor lawfully and in good faith does or causes to be done by reason of and in compliance with this section. Lessee will provide written notice to Lessor at least thirty days prior to any contemplated change in Lessee's name, jurisdiction of organization or chief executive office address.  Lessee will promptly execute, consent to or otherwise authenticate and deliver to Lessor or such other Person, including the International Registry, such further documents, instruments, registrations, assurances and other records and take such further action as Lessor may reasonably request in order to carry out the intent and purpose of this Lease and to establish and protect the rights and remedies created or intended to be created in favor of Lessor hereunder.  Lessee irrevocably appoints Lessor (and any assignee, mortgagee and/or lender of Lessor) its attorney-in-fact to act in Lessee's name and on its behalf to make, execute, deliver and file any instruments or documents and to take any action as Lessor (and any such assignee, mortgagee and/or lender) deems necessary or appropriate to carry out the intent of this Lease or any agreements, documents or instruments related thereto. To the extent appropriate or permissible under applicable law, such appointment is coupled with an interest, will be irrevocable and will terminate only upon payment in full of the obligations set forth in this Lease and/or any agreements, documents or instruments related thereto.

(g)     Time is of the essence in the payment and performance of all of Lessee's obligations under this Lease.  Any action by Lessee against Lessor for any default by Lessor under the Lease shall be commenced within one (1) year after any such cause of action accrues.

(h)     Governing Law.  The Lease shall be governed by and shall be construed and enforced in accordance with the internal laws of the State of New York without regard to conflict of laws principles and Lessor and Lessee agree that the courts of the State of New York have non-exclusive jurisdiction in respect of any claim brought under the Cape Town Treaty relating to the Aircraft.

(i)     **WAIVER OF JURY TRIAL.**  TO THE EXTENT PERMITTED BY APPLICABLE LAW, EACH OF LESSEE AND LESSOR HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES ANY RIGHT EACH MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION BASED ON, OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THE LEASE OR ANY AGREEMENT CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH THE LEASE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY WITH RESPECT HERETO.  THIS PROVISION IS A MATERIAL INDUCEMENT TO LESSOR TO ENTER INTO THIS LEASE.

**SECTION 26.**    Waivers And Amendments.

No covenant or condition of this Lease can be waived or amended except in writing with the consent of Lessor.  Any failure of Lessor to require strict performance by Lessee or any waiver by Lessor of any terms, covenants or agreements herein shall not be construed as a waiver of any other breach of the same or of any other term, covenant or agreement herein.

**SECTION 27.**    Truth in Leasing.

THE AIRCRAFT, BECAME SUBJECT TO THE MAINTENANCE REQUIREMENTS OF PART 135 AS APPLICABLE, OF THE FEDERAL AVIATION REGULATIONS ("FARS") UPON THE REGISTRATION

OF THE AIRCRAFT WITH THE FAA.  LESSEE CERTIFIES THAT DURING THE 12 MONTHS (OR PORTION THEREOF DURING WHICH THE AIRCRAFT HAS BEEN SUBJECT TO U.S. REGISTRATION) PRECEDING THE EXECUTION OF THIS LEASE, THE AIRCRAFT HAS BEEN MAINTAINED AND INSPECTED UNDER PART 135 AS APPLICABLE OF THE FARS.  LESSEE CERTIFIES THAT THE AIRCRAFT WILL BE MAINTAINED AND INSPECTED UNDER PART 135 AS APPLICABLE OF THE FARS FOR OPERATIONS TO BE CONDUCTED UNDER THE LEASE.  UPON EXECUTION OF THIS LEASE, AND DURING THE TERM HEREOF, LESSEE, WHOSE NAME AND ADDRESS ARE SET FORTH IMMEDIATELY BELOW, ACTING BY AND THROUGH THE SIGNATORY HERETO, WHO EXECUTES THIS SECTION SOLELY IN THE CAPACITY SET FORTH BELOW THE SIGNATORY'S SIGNATURE, CERTIFIES THAT LESSEE WILL BE RESPONSIBLE FOR THE OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THE LEASE, UNLESS, THE AIRCRAFT IS SUBLEASED TO AN AIR CARRIER OR AIR TAXI OPERATOR CERTIFICATED UNDER PART 121 OR PART 135, RESPECTIVELY, OF THE FARS. THE NAME, ADDRESS AND SIGNATURE OF THE PERSON RESPONSIBLE FOR OPERATIONAL CONTROL OF THE AIRCRAFT UNDER THIS LEASE ARE SET FORTH IN THIS SECTION 27 AND SUCH PERSON'S EXECUTION HEREOF CONSTITUTES A CERTIFICATION BY SUCH PERSON THAT SUCH PERSON UNDERSTANDS HIS OR HER RESPONSIBILITY FOR COMPLIANCE WITH APPLICABLE FARS.

Name:   CIMA AVIACIÓN, LLC

Signature: ✕ _____

Address:

LESSEE FURTHER CERTIFIES THAT IT UNDERSTANDS ITS RESPONSIBILITIES FOR COMPLIANCE WITH APPLICABLE FARS.  AN EXPLANATION OF FACTORS BEARING ON OPERATIONAL CONTROL AND PERTINENT FARS CAN BE OBTAINED FROM THE NEAREST FEDERAL AVIATION FLIGHT STANDARD DISTRICT OFFICE, GENERAL AVIATION DISTRICT OFFICE OR AIR CARRIER DISTRICT OFFICE.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, the parties hereto have caused the Lease to be duly executed by the respective officers thereunto duly authorized.

LESSEE:

CIMA AVIACIÓN, LLC

By:_____

Jay Johnston, CEO
(Name and Title)

LESSOR:

WACHOVIA FINANCIAL SERVICES, INC.

By:_____

_____
(Name and Title)

IN WITNESS WHEREOF, the parties hereto have caused the Lease to be duly executed by the respective officers thereunto duly authorized.

LESSEE:

CIMA AVIACIÓN, LLC

By:_____

_____
(Name and Title)

LESSOR:

WACHOVIA FINANCIAL SERVICES, INC.

By:_____
                    Linda Baxter
_____
(Name and Title)  Vice President

## EXHIBIT A

### Definitions

(a)     All references in the Lease to designated Sections and other subdivisions are to such designated Sections and other subdivisions only, and the words "herein," "hereof" "hereunder" and other words of similar import refer to the Lease as whole and not to any particular Section or other subdivision.

(b)     Except as otherwise indicated, all the agreements and instruments defined herein or in the Lease means such agreements and instruments as the same may from time to time be supplemented or amended, or as the terms thereof may be waived or modified to the extent permitted by, and in accordance with, the terms thereof.

(c)     The terms defined in the Lease will, for purposes of the Lease and all Lease Supplements, schedules and exhibits thereto, have the meanings assigned to them and will include the plural as well as the singular as the context requires.

(d)     The terms "including", "includes" and "include" will be deemed to be followed by the words "without limitation".

(e)     The following terms have the following meanings for all purposes of the Lease:

"Acceptance Date" means the date (which date shall be no later than the date designated as the "Last Acceptance Date" on Lease Supplement No. 1) on which Lessee has irrevocably and unconditionally accepted the Aircraft for lease under the Lease as evidenced by the execution and delivery of Lease Supplement No. 1 relating thereto dated such date.

"Act" means Subtitle VII of Title 49 of the United States Code, as amended and re-codified.

"Additions" has the meaning set forth in Section 11 of the Lease.

"Additional Insureds" has the meaning set forth in Section 14(b) of the Lease.

"Aircraft" means (i) the Airframe, (ii) the Engines, and (iii) where the context permits, the Records.

"Aircraft Marking" has the meaning set forth in Section 11(f)(iv) of the Lease.

"Airframe" means (i) the airframe described in Lease Supplement No. 1, and, unless the context requires otherwise, shall not include the Engines and (ii) any and all Parts from time to time incorporated in, installed on or attached to such Airframe and any and all Parts removed therefrom so long as title thereto will remain vested in Lessor in accordance with the applicable terms of this Lease after removal from the Airframe.

"Alterations" has the meaning set forth in Section 11 of the Lease.

"Basic Rent" has the meaning set forth in Section 3 of the Lease.

"Basic Rent Date" has the meaning set forth in Schedule 2 to Lease Supplement No. 1 to the Lease.

"Basic Term" means the term for which the Aircraft is leased under the Lease beginning on the Acceptance Date and ending on the Expiration Date.

"Bill of Sale" has the meaning set forth in Section 2 of the Lease.

"Business Day" means any day other than a Saturday, Sunday or other day on which banks located in Charlotte, North Carolina are required or permitted to be closed or are authorized to close.

"Cape Town Treaty" has the meaning provided in 49 U.S.C. § 44113(1).

"Casualty Value" will be the amount set forth on Schedule No. 3 to Lease Supplement No. 1 to the Lease for the applicable Basic Rent Date except that, in the case of an Event of Loss covered by the insurance required to be maintained by Lessee pursuant to Section 14(b) of the Lease (or which would have been covered by such insurance, had such insurance been maintained as required), Casualty Value means the higher of fair market sales value (as determined in accordance with the provisions of Section 23 hereof) or the amount set forth on Schedule No. 3 to Lease Supplement No. 1.

"Code" means the Internal Revenue Code of 1986, as amended.

"Daily Lease Rate" has the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Default" means an event or circumstance which, after the giving of notice or lapse of time, or both, would become an Event of Default.

"Early Purchase Date" shall have the meaning set forth in Section 23(e) of the Lease.

"Early Purchase Option Amount" shall be the amount payable by the Lessee in the event that it exercises its option to purchase the Aircraft pursuant to Section 23(e) hereof, and shall have the value set forth on Schedule 2 to Lease Supplement No. 1 to the Lease for the applicable Early Purchase Date.

"Engine" means (i) each of the engines described and listed by manufacturer's serial numbers in Lease Supplement No. 1 whether or not thereafter installed on such Airframe or any other airframe from time to time; (ii) any engine which may from time to time be substituted, pursuant to the applicable terms of this Lease, for an Engine leased hereunder and (iii) in each case set forth in clauses (i) and (ii) hereof, with any and all Parts incorporated in or installed on or attached to such Engine or engine or any and all Parts removed therefrom so long as title thereto shall remain vested in Lessor in accordance with the applicable terms of this Lease after removal from such Engine. The term "Engines" means, as of any date of determination, all Engines leased hereunder.

"Estimated Annual Hours" means the anticipated number of average annual flight hours as shown on Schedule No. 2 to Lease Supplement No. 1.

"Event of Default" has the meaning set forth in Section 18 of the Lease.

"Event of Loss" with respect to the Aircraft, the Airframe, any Propellers or any Engine means any of the following events with respect to such property (i) loss of such property or the use thereof due to theft, disappearance, destruction, damage beyond repair or rendition of such property permanently unfit for normal use for any reason whatsoever; (ii) any damage to such property which results in an insurance settlement with respect to such property on the basis of a total loss or constructive total loss; (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, such property by the act of any government (foreign or domestic) or of any state or local authority or any instrumentality or agency of the foregoing ("Requisition of Use"); (iv) as a result of any rule, regulation, order or other action by any government (foreign or domestic) or governmental body (including the FAA or any similar foreign governmental body) having jurisdiction, the use of such property has been prohibited, or such property has been declared unfit for use, for a period of six (6) consecutive months, unless Lessee, prior to the expiration of such six-month period, will have undertaken and, in the opinion of Lessor, will be diligently carrying forward all steps necessary or desirable to permit the normal use thereof by Lessee or, in any event, if use has been prohibited, or such property has been declared unfit for use, for a period of twelve (12) consecutive months; (v) with respect to an Engine, the removal thereof from the Airframe for a period of six (6) months or longer, whether or not such Engine is operational or (vi) such property will be returned to the Manufacturer, other than for modification required as a result of patent infringement or for repair or replacement (any such return being herein referred to as a "Return to Manufacturer"). The date of any Event of Loss will be the date of such theft, disappearance, destruction, damage, Requisition of Use, prohibition, unfitness for use for the stated period, removal for the stated period or Return to Manufacturer. An Event of Loss with respect to the Aircraft will be deemed to have occurred if any Event of Loss occurs with respect to the Airframe. An Event of Loss with respect to any Engine will not, without loss of the Airframe, be deemed an Event of Loss with respect to the Aircraft.

"Expiration Date" means the date set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"FAA" means the United States Federal Aviation Administration and any successor agency or agencies thereto.

"FAA Counsel" means Daugherty, Fowler, Peregrin, Haught & Jensen, P.C., Oklahoma City, Oklahoma 73102, or such other counsel as Lessor may designate.

"FARS" has the meaning set forth in Section 27 of the Lease.

"First Basic Rent Date" has the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Guarantor" means any guarantor of Lessee's obligations under the Lease.

"Guaranty" means individually and collectively, any agreement under which any Guarantor guarantees Lessee's obligations owed to Lessor.

"Impositions" has the meaning set forth in Section 10 of the Lease.

"Insurance Requirements Letter" means a letter certified therein as "Insurance Requirements" issued by Lessor setting forth certain of the insurance requirements required by the Lease with respect to the Aircraft.

"International Interest has the meaning provided thereto in the Cape Town Treaty.

"International Registry" means the registry established under the Cape Town Treaty.

"International Registry Regulations" shall mean the official English language text of the regulations for the International Registry issued y the supervisory authority thereof pursuant to the Cape Town Treaty, as the same may be amended or modified from time to time.

"Last Basic Rent Date" has the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Late Payment Rate" means the lesser of 1.5% per month or the highest rate permitted by applicable law computed on the basis of a 360 day year and 30 day month.

"Lease Supplement No. 1" means a supplement to the Lease to be entered into as of the first Progress Payment Funding Date by Lessor and Lessee, which supplement will be substantially in the form as attached to the Lease and identified as Lease Supplement No. 1.

"Lessee" is defined in the first paragraph of the Lease.

"Lessor Assignee" has the meaning specified in Section 16(b) of the Lease.

"Lessor Transfer" has the meaning specified in Section 16(b) of the Lease.

"Lessor's Cost" shall have meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Lessor's Liens" means any Liens created or granted by Lessor with respect to Lessor's purchase or financing of the Aircraft or resulting from claims against Lessor not related to Lessor's ownership of the Aircraft.

"Liability" has the meaning specified in Section 15 of the Lease.

"Liens" means all liens, charges, security interests, and encumbrances of every nature and description whatsoever, including liens, charges, security interests and encumbrances with respect to Impositions, International Interests, Prospective International Interests and Prospective Sales and rights of third parties under management, pooling, interchange, overhaul, repair or other similar agreements or arrangements.

"LIBOR" means, with respect to any period for which the same is to be calculated, the rate per annum (calculated on the basis of a 360-day year and the actual number of days elapsed) offered for U.S. dollar deposits in the London interbank market for one month as reported on Reuters Screen LIBOR01 Page (or comparable replacement page) as of 11:00 a.m., London time, on the second London Business Day before the first day of each such period (or if not so reported, then as determined by Lessor from another recognized source or interbank quotation).

"MACRS" means modified accelerated cost recovery system, as defined in the Code.

"Manufacturer" means the manufacturers identified on Schedule No. 1 to Lease Supplement No. 1, as applicable.

"Material Adverse Change" shall mean (i) a material adverse event, change, effect, development, condition or occurrence on or with respect to the business, results of operations or financial condition (including assets and liabilities) of the Lessee and its subsidiaries taken as a whole; provided, however, that, Material Adverse Change shall not be deemed to include any event, change, effect, development, condition or occurrence to the extent resulting from (A) changes in general economic conditions (including those affecting the financial, banking, currency, interest rates or capital markets); (B) conditions generally affecting any of the industries or markets in which the Lessee and its subsidiaries operate; (C) acts of terrorism or war, including the engagement by the United States of America or any other country in hostilities, and whether or not pursuant to the declaration of a national emergency or war, or any earthquakes, hurricanes or other natural disasters; provided further that such matters in the case of Clauses (A), (B) and (C) shall be taken into account in determining a Material Adverse Change to the extent of any disproportionate effect on the Lessee and its subsidiaries, taken as a whole, relative to other companies operating in the same industries and geographic markets as the Lessee and its Subsidiaries or (ii) any event, change, effect, development, condition or occurrence that materially adversely effects the ability of the Lessee to timely perform its obligations under and consummate the transactions contemplated by this Agreement.

"Maximum Aggregate Amount" has the meaning set forth in the Progress Payment Instructions.

"Parts" means all appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature (other than complete Engines or engines), which are from time to time incorporated or installed in or attached to an Airframe or any Engine and all such items which are subsequently removed therefrom so long as Lessor has title thereto pursuant to the terms hereof.

"Permitted Liens" means (a) the rights of Persons under agreements or arrangements expressly permitted by the terms of Section 16 of the Lease, (b) Lessor's Liens, (c) the rights of Lessor as set forth in the Lease, and (d) Liens for taxes either not yet due or being contested by Lessee in good faith and inchoate materialmen's, mechanic's, workmen's, repairmen's, employee's or other like Liens arising in the ordinary course of business of Lessee for sums not yet delinquent or being contested in good faith (and, in each case, for the payment of which adequate assurances and/or security have, in Lessor's sole judgment, been provided to Lessor) with due diligence and by appropriate proceedings, if counsel for Lessor has determined in its sole opinion that the nonpayment of any such tax or Lien or the contest of any such payment in such proceedings does not and will not adversely affect the title, property or rights of Lessor.

"Person" means any individual, partnership, corporation, trust, association, joint venture, joint stock company, or non-incorporated organization or government or any department or agency thereof, or any other entity of any kind whatsoever.

"Primary Hangar Location" means the location designated as such in Schedule No. 2 to Lease Supplement No. 1.

"Professional User Entity" shall have the meaning ascribed thereto in the International Registry Regulations and shall, with respect to Lessee, be the Person designated as such on Schedule No. 2 to any Lease Supplement.

"Progress Payment Funding Date" shall have the meaning ascribed thereto in the Progress Payment Instructions.

"Progress Payment Instructions" means the Progress Payment Instructions substantially in the form attached to the Lease as Schedule No. 4 to Lease Supplement No. 1.

"Prohibited Transfer" has the meaning set forth in Section 18(a)(ix).

"Projected Realized Value" has the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Propeller(s)" means the propellers described and listed by manufacturer's serial numbers listed in Schedule No. 1 to Lease Supplement No. 1.

"Prospective International Interest" has the meaning provided thereto in the Cape Town Treaty.

"Prospective Sale" has the meaning provided thereto in the Cape Town Treaty.

"Purchase Agreement" means that certain Sales Agreement dated December 14, 2007, between Lessee and the Airframe Manufacturer.

"Purchase Agreement Assignment" means that certain Purchase Agreement Assignment dated as of the first Progress Payment Funding Date between Lessor and Lessee and consented to by the Airframe Manufacturer.

"Purchase Documents" means the Purchase Agreement, the Purchase Agreement Assignment, the Bill of Sale, the Warranty Bill of Sale and such other documents as Lessor considers necessary or advisable in order to convey to Lessor title to the Aircraft as contemplated under the Lease, which documents will be in form and substance satisfactory to Lessor.

"Records" means any and all logs, manuals, certificates, date and inspection, modification, maintenance, engineering, technical and overhaul records (including all computerized data, records and materials of any kind whatsoever) with respect to the Aircraft, including all records required to be maintained by the FAA or any other governmental agency or authority having jurisdiction with respect to the Aircraft or any Manufacturer or supplier of the Aircraft (or any part thereof) with respect to the enforcement of warranties or otherwise, which Records will be at all times the property of Lessor after the Acceptance Date.

"Remedy Date" has the meaning set forth in Section 19 of the Lease.

"Renewal Term" has the meaning set forth in Section 23(b) of the Lease.

"Rent" has the meaning set forth in Section 3 of the Lease.

"Rent Commencement Date" has the meaning set forth in Schedule No. 2 to Lease Supplement No. 1 to the Lease.

"Requisition of Use" has the meaning set forth in the Event of Loss definition contained herein.

"Return to Manufacturer" has the meaning set forth in the Event of Loss definition contained herein.

"Security Deposit" shall have the meaning set forth in Section 3(d).

"Supplemental Rent" has the meaning set forth in Section 3 of the Lease.

"Supplemental Term" means, the period commencing on the date Lessor makes payment of a portion of the purchase price for the Aircraft (or portion thereof) to the Manufacturer, as indicated in the Progress Payment Instructions, and unless this Lease is sooner terminated pursuant to the provisions thereof, ending on the day preceding the Final Funding Date, both dates inclusive.

"Tangible Net Worth" means, as of any date of determination, the sum of the capital stock and additional paid-in capital (net of treasury stock) plus retained earnings of Lessee or any Guarantor, as applicable, and its subsidiaries, minus intangible assets (including, without limitation, franchises, licenses, patents, patent applications, trademarks, trade names, copyrights, service marks, brand names, goodwill and research and development expenses) determined in conformity with generally accepted accounting principles.

"Term" means the Supplemental Term, the Basic Term and any Renewal Term entered into pursuant to Section 23(b) of the Lease.

"Total Liabilities" means all liabilities of Lessee or any Guarantor, as applicable, including capitalized leases and all reserves for deferred taxes, and other deferred sums appearing on the liabilities side of a balance sheet and all obligations as lessee under off-balance sheet synthetic leases and or operating leases (discounted using the Prime Rate of interest published in the then current Federal Reserve H.15 Statistical Release) of Lessee or any Guarantor, as applicable, less debt fully subordinated to Lessor on terms and conditions acceptable to Lessor, all in accordance with generally accepted accounting principles applied on a consistent basis.

"Transacting User Entity" shall have the meaning ascribed thereto in the International Registry Regulations.

"UCC" means the Uniform Commercial Code as in effect in the applicable jurisdiction.

"Warranty Bill of Sale" means a warranty bill of sale in the form of Exhibit B to the Lease.

**LEASE SUPPLEMENT NO. 1**
**To**
**AIRCRAFT LEASE**

**THIS IS A CERTIFICATE ACKNOWLEDGING ACCEPTANCE OF THE AIRCRAFT FOR PURPOSES OF THE BELOW-REFERENCED LEASE. THIS IS NOT A DELIVERY RECEIPT.**

This Lease Supplement No. 1 to the AIRCRAFT LEASE is dated as of January 31, 2008, (the "Lease") and by and among WACHOVIA FINANCIAL SERVICES, INC., a North Carolina corporation ("Lessor"), One Wachovia Center, Mail Code NC0738, Charlotte, North Carolina 28288-0738, and CIMA AVIACIÓN, LLC, a Puerto Rico limited liability company, as lessee ("Lessee").

(a)     The Aircraft.

Lessee hereby acknowledges, agrees and certifies that the Aircraft as set forth and described in Schedule No. 1 hereto is in Lessee's possession, has been inspected by Lessee to its complete satisfaction, has been found to be in good working order, repair and condition and fully equipped to operate as required under applicable law for its purpose, is of a size, design, capacity and manufacture selected by Lessee and suitable for Lessee's purposes, and is, as of the date set forth below, unconditionally, irrevocably and fully accepted by Lessee for lease under the Lease. Lessee hereby further unconditionally and irrevocably reaffirms its representations, warranties, covenants and acknowledgments in the Lease and agrees that the Lease provides in favor of Lessor an International Interest in the Aircraft. All capitalized terms used herein that are not otherwise defined herein have the meanings given to such terms in the Lease.

(b)     Representations and Warranties.

Lessee hereby represents and warrants to Lessor that on the date hereof:

(1)     The representations and warranties of Lessee set forth in the Lease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof or will be true and correct as of the Acceptance Date, with the same force and effect as if the same had been made on this date.

(2)     Lessee has satisfied or complied with all conditions precedent and requirements as set forth in the Lease and Lease Supplements that are required to be or to have been satisfied or complied with on or prior to the date hereof r will satisfy or complete such conditions precedent and requirements prior to the Acceptance Date.

(3)     No Default or Event of Default under the Lease has occurred and is continuing on the date hereof.

(4)     Lessee has obtained or will obtain prior to the Acceptance Date, and there are in full force and effect, such insurance policies with respect to the Aircraft as are required to be obtained under the terms of the Lease.

(5)     Lessee has furnished no equipment for the Aircraft other than as stated on Schedule No. 1 hereto or permitted as an Addition thereto pursuant to the Lease.

(6)     The facts, terms, information, description and costs set forth in the attached Schedules No. 1, No. 2 and No. 3 hereto are true, complete, accurate and correct.

(7)     The Lease is a "finance lease" under Section 2A-103(g) of the UCC.

The date of unconditional, irrevocable and final acceptance by Lessee shall be the Acceptance Date.

[The remainder of this page is intentionally left blank]

CHAR1\1037247v5

IN WITNESS WHEREOF, Lessee has caused this Lease Supplement No. 1 to be duly executed by its officers thereunto duly authorized.

WACHOVIA FINANCIAL SERVICES, INC., as Lessor

By:_____

Title:_____
       Linda Baxter
       Vice President

Date:_____1/31/08_____

CIMA AVIACIÓN, LLC, as Lessee

By:_____

Title:_____

Date:_____

IN WITNESS WHEREOF, Lessee has caused this Lease Supplement No. 1 to be duly executed by its officers thereunto duly authorized.

WACHOVIA FINANCIAL SERVICES, INC., as Lessor

By: _____

Title: _____

Date: _____

CIMA AVIACIÓN, LLC, as Lessee

By: _____

Title: CEO _____

Date: 1/30/08 _____

## SCHEDULE NO. 1
### TO
## LEASE SUPPLEMENT NO. 1

### DESCRIPTION OF AIRFRAME AND ENGINES

### AIRFRAME

| Manufacturer | Model | U.S. Registration No. | Mfg. Serial No. |
|---|---|---|---|
| Israel Aerospace Industries, Ltd. | Gulfstream G150 | N993AC | 265 |

(which can transport at least (8) persons (including crew), or goods in excess of 2750 kilograms)

### ENGINES

| Manufacturer | Model | Mfg. Serial No. |
|---|---|---|
| Honeywell | TFE731-40AR-200G | P126224 |
| Honeywell | TFE731-40AR-200G | P126225 |

(each of which Engine has 550 or more rated takeoff and at least 1750 pounds of thrust or its equivalent)

CHAR1\1037247v5

## SCHEDULE NO. 2
### TO
### LEASE SUPPLEMENT NO. 1

*[Intentionally omitted from FAA filing counterpart as containing confidential financial information.]*

### Financial Terms

| | |
|---|---|
| Security Deposit: | $1,042,000.00 |
| Rent Commencement Date: | January 31, 2008 |
| Basic Term: | Eighty-four (84) months commencing on the First Basic Rent Date and through and including November 20, 2015 |
| Basic Rent: | $90,122.63 |
| Basic Rent Dates: | Payments of Basic Rent shall be made monthly in advance commencing on the First Basic Rent Date and continuing on the same day of each and every calendar month through the Last Basic Rent Date. |
| First Basic Rent Date: | November 20, 2008 |
| Last Basic Rent Date: | The eighty-four (84) month anniversary of the First Basic Rent Date. |
| Expiration Date: | The eighty-four (84) month anniversary of the First Basic Rent Date. |
| Primary Hangar Location: | Hangar 3A, South Ramp<br>Isla Grande Airport<br>San Juan, Puerto Rico 00907 |
| Chief Executive Offices<br>and Principal Place of Business | City View Plaza II<br>48 Carr 165, Ste 6000<br>Guaynabo, PR 00968-8060 |
| Acceptance Date: | November 20, 2008 |
| Last Acceptance Date: | December 1, 2008 |
| Lessor's Cost: | $14,470,500.00 |
| Supplemental Rent: | For each day from the Rent Commencement Date until the First Basic Rent Date, Supplemental Rent shall accrue in an amount equal to the following product: (i) the amounts funded by Lessor pursuant to any Progress Payment Instructions and (ii) LIBOR plus 1.35% in effect |

(A) on the first day of the month of the Rent Commencement Date and (B) thereafter on the first day of each month until the First Basic Rent Date, divided by (iii) three hundred sixty (360). Supplemental Rent shall be payable monthly in arrears on the fifteenth (15th) day of every month of the Supplemental Term with the final payment being due and payable on the earlier of the Acceptance Date for the Aircraft and the Outside Delivery Date (defined below). Upon the First Basic Rent Date, Lessor shall provide a Replacement Schedule 2 to Lease Supplement No. 1 which shall set forth the amount of Basic Rent and a replacement Schedule No. 3 to Lease Supplement No. 1 which shall set forth the Casualty Value. Upon any termination of the Lease prior to the Final Payment Funding Date, Lessee shall pay all amounts funded by Lessor pursuant hereto and any Progress Payment Instructions, all accrued Rent pursuant thereto and all other amounts due and owing under the Lease.

| | |
|---|---|
| Estimated Annual Hours | 600 |

Early Purchase Option Amounts:

| Early Purchase Dates | Amount |
|---|---|
| November 20, 2011 | 93.00439% of Lessor's Cost |
| November 20, 2013 | 84.92673% of Lessor's Cost |

| | |
|---|---|
| Projected Realized Value | $8,747,180.67 |

### SCHEDULE NO. 3
### TO
### LEASE SUPPLEMENT NO. 1

#### Casualty Values

*[Intentionally omitted from FAA filing counterpart as containing confidential financial information.]*

The Casualty Value of the Aircraft from the Acceptance Date until the First Basic Rent Date shall be the sum of: Lessor's Cost, plus any amounts funded pursuant to any Progress Payment Instructions, plus all accrued and unpaid Basic Rent and all accrued and unpaid rent payable pursuant to any Progress Payment Instructions and all other amounts due and owing under the Lease.

The Casualty Value of the Aircraft from the First Basic Rent Date until the expiration of the Term shall be the product of Lessor's Cost and the percentage indicated below as of the date of calculation.

| RENTAL PAYMENT NUMBER | CASUALTY VALUE * | RENTAL PAYMENT NUMBER | CASUALTY VALUE * |
|---|---|---|---|
| 1 | 101.02560000% | 43 | 94.11760278% |
| 2 | 101.10971684% | 44 | 93.79371363% |
| 3 | 101.16887080% | 45 | 93.46714566% |
| 4 | 101.22637389% | 46 | 93.13854172% |
| 5 | 101.28222146% | 47 | 92.80789607% |
| 6 | 101.33640885% | 48 | 92.47455258% |
| 7 | 101.38130541% | 49 | 92.13915403% |
| 8 | 101.42451097% | 50 | 91.80169465% |
| 9 | 101.45839477% | 51 | 91.46151824% |
| 10 | 101.49055656% | 52 | 91.11926753% |
| 11 | 101.52099147% | 53 | 90.77493670% |
| 12 | 101.54206868% | 54 | 90.42851987% |
| 13 | 101.56138780% | 55 | 90.07936079% |
| 14 | 101.57894390% | 56 | 89.72810213% |
| 15 | 101.58710603% | 57 | 89.37408759% |
| 16 | 101.59347371% | 58 | 89.01795980% |
| 17 | 101.59804189% | 59 | 88.65971279% |
| 18 | 101.35185551% | 60 | 88.29869023% |
| 19 | 101.09936932% | 61 | 87.93553468% |
| 20 | 100.84505575% | 62 | 87.57024013% |
| 21 | 100.58441949% | 63 | 87.20215019% |
| 22 | 100.32193290% | 64 | 86.83190735% |
| 23 | 100.05759077% | 65 | 86.45950557% |
| 24 | 99.78689771% | 66 | 86.08493875% |
| 25 | 99.51432601% | 67 | 85.70755043% |
| 26 | 99.23987036% | 68 | 85.32798303% |
| 27 | 98.95903532% | 69 | 84.93558005% |
| 28 | 98.67629306% | 70 | 84.30203388% |
| 29 | 98.39163823% | 71 | 83.66628834% |
| 30 | 98.10506544% | 72 | 83.02768686% |
| 31 | 97.81431900% | 73 | 82.38687178% |
| 32 | 97.52163744% | 74 | 81.74383687% |

| 33 | 97.22476504% | 75 | 81.09792549% |
|----|--------------|----|--------------|
| 34 | 96.92594027% | 76 | 80.44977993% |
| 35 | 96.62515764% | 77 | 79.79939390% |
| 36 | 96.32016135% | 78 | 79.14676109% |
| 37 | 96.01318983% | 79 | 78.52580501% |
| 38 | 95.70423750% | 80 | 77.90268501% |
| 39 | 95.39104851% | 81 | 77.31132484% |
| 40 | 95.07586122% | 82 | 76.71788408% |
| 41 | 94.75867000% | 83 | 76.12235689% |
| 42 | 94.43946920% | 84 | 75.80761722% |

* Values are calculated on the basis that any Basic Rent Amount payable on such date has not been paid.

## SCHEDULE NO. 4
### TO
### LEASE SUPPLEMENT NO. 1

*[Intentionally omitted from FAA filing counterpart as containing confidential financial information.]*

PROGRESS PAYMENT INSTRUCTIONS NO. 1
(Lease Supplement No. 1)

CIMA AVIACIÓN. LLC ("Lessee") hereby issues to WACHOVIA FINANCIAL SERVICES, INC. ("Lessor") this Progress Payment Instructions No. 1 dated as of January ____, 2008 ("Progress Payment Instructions") in accordance with the terms of the Aircraft Lease (the "Lease") dated as of January ____, 2008. All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Lease.

Lessee confirms that the payment indicated on the copy of the invoice attached hereto as Annex A is properly due and owing, and Lessee hereby instructs Lessor to make payment in accordance with said invoice on the date hereof (the "Progress Payment Funding Date"). Lessee hereby certifies, represents, warrants and agrees that on the date hereof: (1) The representations and warranties of Lessee set forth in the Lease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof, with the same force and effect as if the same had been made on this date. (2) Lessee has satisfied or complied with all conditions precedent and requirements as set forth in the Lease and Lease Supplements that are required to be or to have been satisfied or complied with on or prior to the date hereof, and (3) No Default or Event of Default under the Lease has occurred and is continuing on the date hereof.

The Maximum Aggregate Amount is $14,470,500.00.

For each day from the Progress Payment Funding Date until date of the Final Payment Funding Date, Rent shall accrue in an amount equal to the following product: (i) the amount funded pursuant to this Progress Payment Instructions No. 1 plus any amounts funded by Lessor pursuant to any Progress Payment Instructions and (ii) LIBOR plus 1.35 % in effect (A) on the first day of the month of the date of this Progress Payment Instructions and (B) thereafter on the first day of each month until the First Basic Rent Date, divided by (iii) three hundred sixty (360). Supplemental Rent shall be payable monthly in arrears on the fifteenth (15th) day of every month of the Supplemental Term with the final payment being due and payable on the on the earlier of the Acceptance Date for the Aircraft and the Outside Delivery Date (defined below).

In order to secure Lessee's obligations under these Progress Payment Instructions and under the Lease, including any Lease Supplement, Lessee hereby assigns, bargains, grants, sells, transfers, conveys, mortgages and pledges to Lessor all of Lessee's right, title and interest (but specifically excluding any obligations) in, to and under any and all warranties, purchase agreements, purchase orders and invoices with respect to the Equipment and Lessee hereby authorizes Lessor, at the expense of Lessee, to prepare and file such financing statements (including renewal statements) or amendments thereof or supplements thereto or other instruments as Lessor may from time to time deem necessary or appropriate in order to perfect and maintain the security interests granted hereunder in accordance with the UCC and such other instruments as Lessor determines are necessary or required to carry out the intent and purpose of these Progress Payment Instructions, including, without limitation, any purchase agreement assignment.

Lessee agrees that the Aircraft subject to the attached invoice shall be delivered to and placed in service by Lessee on or before December 1, 2008 (the "Outside Delivery Date"). In the event, for any reason whatsoever, that on or before that date, the Aircraft has not been delivered to and placed in service by Lessee or all of the conditions set forth in the Lease for Lessor to acquire the Aircraft have not been satisfied, Lessor shall have the option, in its sole discretion, to (1) require Lessee to purchase from Lessor, on an as-is and where-is basis without warranty, express or implied, with respect to any matter whatsoever, all of Lessor's right, title and interest in and to the Purchase Agreement for the aggregate total amount which Lessor has paid therefore (including under any other Progress Payment Instructions with respect to the Aircraft but without duplication of such payments), plus all Supplemental Rent (including under any other Progress Payment Instructions with respect to such Equipment but without duplication of such payments) to and including the date of such payment under the terms of these Progress Payment Instructions, and all other sums due and

owing under the Lease, or (ii) re-price and restructure the terms of the Lease.  The Outside Delivery Date stated in this paragraph may be extended at the sole option of Lessor.

[The remainder of this page is intentionally left blank.]

IN WITNESS WHEREOF, Lessee has executed these Progress Payment Instructions on this _____ day of January, 2008.

CIMA AVIACIÓN, LLC, Lessee

By:_____
Name: _____
Title:_____

ANNEX A
TO PROGRESS PAYMENT INSTRUCTIONS NO. 1
(Invoice)

**SCHEDULE NO. 5**
**TO**
**LEASE SUPPLEMENT NO. 1**
*[Intentionally omitted from FAA filing counterpart as containing confidential financial information.]*

FINAL PAYMENT INSTRUCTIONS
(Lease Supplement No. 1)

CIMA AVIACIÓN, LLC ("Lessee") hereby issues to WACHOVIA FINANCIAL SERVICES, INC. ("Lessor") these Progress Payment Instructions No. [__] dated as of _____ __ , 20__ ("Final Payment Instructions") in accordance with the terms of the Aircraft Lease (the "Lease") dated as of _____ __, 20__. All capitalized terms used herein without definition shall have the meanings ascribed to such terms in the Lease.

Lessee confirms that the payment for the Aircraft indicated on the copy of the invoice attached hereto as Annex A is properly due and owing, and Lessee hereby instructs Lessor to make payment in accordance with said invoice on the date hereof (the "Final Payment Funding Date"). Lessee hereby certifies, represents, warrants and agrees that on the date hereof: (1) The representations and warranties of Lessee set forth in the Lease and all certificates and opinions delivered in connection therewith were true and correct in all respects when made and are true and correct as of the date hereof, with the same force and effect as if the same had been made on this date. (2) Lessee has satisfied or complied with all conditions precedent and requirements as set forth in the Lease and Lease Supplements that are required to be or to have been satisfied or complied with on or prior to the date hereof. (3) No Default or Event of Default under the Lease has occurred and is continuing on the date hereof, (4) Lessee has obtained, and there are in full force and effect, such insurance policies with respect to the Aircraft as are required to be obtained under the terms of the Lease, (5) the Manufacturer has performed all of its obligations under the Purchase Agreement and no further amount is due and owing under the Purchase Agreement, (6) Lessor has received evidence that the Aircraft has been duly certified as to type and airworthiness by the FAA in the form of a standard Airworthiness Certificate (FAA AC Form 8100-2) issued by the FAA, and (7) the payments indicated herein and on the copy of the invoice(s) attached hereto as Annex A is/are properly due and owing.

Lessee authorizes and directs Lessor to pay the Manufacturer on the date hereof the amount shown in the attached invoice with respect to the equipment and services identified therein and performed pursuant to the terms of the Purchase Agreement.

Lessee confirms that the funding amount requested herein shall be the final funding under the Lease and that the date on which such final funding occurs shall be the Final Funding Date.

IN WITNESS WHEREOF, Lessee has executed these Final Payment Instructions on this _____ day of _____, 20__.

CIMA AVIACIÓN, LLC
Lessee


By: EXHIBIT ONLY - DO NOT SIGN
Name: _____
Title:_____

ANNEX A
FINAL PAYMENT INSTRUCTIONS
(Lease Supplement No. 2)

(Invoice)

**EXHIBIT B**

[WARRANTY BILL OF SALE]



## WARRANTY BILL OF SALE

KNOW ALL MEN BY THESE PRESENTS, that GULFSTREAM AEROSPACE LP, (hereinafter "GULFSTREAM"), in consideration of the sum of ONE DOLLAR ($1.00) and other good and valuable consideration to it paid by:

**Wachovia Financial Services, Inc.**
**One Wachovia Center**
**Mail Code NC0738**
**Charlotte, NC 28288-0783**

(hereinafter the "BUYER"), the receipt whereof is hereby acknowledged, hereby sells, grants, transfers and delivers to the BUYER, its successors and assigns, all GULFSTREAM's right, title and interest in and to the Aircraft (Gulfstream G150, Serial Number 265), together with the engines installed thereon, described as Honeywell TFE 731-40AR-200G engines, Serial Numbers P126224 (left) and P126225 (right), together also with all appliances, parts, instruments, appurtenances, accessories, furnishings and other equipment of whatever nature installed on the Aircraft pursuant to that Gulfstream G150 Sales Agreement dated December 7, 2007(said aircraft, engines, appliances, parts, instruments, appurtenances, accessories, furnishings, and other equipment being hereinafter collectively called the "Aircraft").

GULFSTREAM hereby represents, warrants and agrees that it is the lawful owner of the full legal and beneficial title to the Aircraft; that the Aircraft is free from all liens and encumbrances; that GULFSTREAM has the right to sell the same as aforesaid and that GULFSTREAM will warrant and defend the sale of the Aircraft and BUYER's title thereto against the claims and demands of all persons.

IN WITNESS WHEREOF, GULFSTREAM has caused this Warranty Bill of Sale to be signed by its duly authorized officer this _____ day of November, 2008.

GULFSTREAM AEROSPACE LP:

BY: _____

ITS: <u>SENIOR CONTRACT MANAGER</u>

## EXHIBIT C

## SPECIAL TAX INDEMNITY ADDENDUM

This Special Tax Indemnity Addendum ("Tax Addendum") to Aircraft Lease is dated as of January ___, 2008, (the "Lease") and by and among WACHOVIA FINANCIAL SERVICES, INC., a North Carolina corporation, One Wachovia Center, Mail Code NC0738, Charlotte, North Carolina 28288-0738, as lessor ("Lessor"), and CIMA AVIACIÓN, LLC, a Puerto Rico limited liability, c/o Arco Capital Management LLC, City View Plaza, Suite 800, Road 165 Km 1.2, Guaynabo, Puerto Rico 00698, as Lessee ("Lessee").

All capitalized terms used herein which are not otherwise defined herein shall have the meanings given to such terms in the Lease.

(a)     Assumptions.  Lessor and Lessee intend that the lease of the Aircraft described in this Lease be treated as a true lease for federal, state and local (not including Puerto Rico) income tax purposes and that Lessor be the owner of such Aircraft and Lessee be the lessee thereof.  Lessee hereby acknowledges that the Basic Rent has been determined, and Lessor has executed this Lease, on the basis of the following tax assumptions for federal, state and local (not including Puerto Rico) income tax purposes:

(i)     Lessor shall be entitled to modified accelerated cost recovery deductions with respect one hundred percent (100%) of Lessor's Cost under section 168 of the Code (I) using the 200% declining balance recovery method, switching to the straight line method for the first taxable year of Lessor for which such method yields a larger allowance; (II) using the half-year convention; (III) assuming a zero salvage value and (IV) using the recovery period specified in section 168(c)(1) of the Code of seven (7) years (the "Depreciation Deductions").

(ii)     Lessor shall not be required to include in its gross income for any taxable year any amount with respect to transactions contemplated by the Lease other than (I) Basic Rent, (II) any payment to Lessor of Casualty Value to the extent such payment exceeds Lessor's tax basis in the Aircraft at that time or (III) the purchase price required to be paid pursuant to any purchase option granted pursuant to this Lease to the extent such payment exceeds Lessor's tax basis in the Aircraft at such time ("Anticipated Income").

(iii)     Lessor will be subject to state and local (not including Puerto Rico) income taxes on the same basis as Lessor is subject to federal income tax, amounts will be includible in its gross income for state and local (not including Puerto Rico) income tax purposes only if, to the same extent, and at the same time such amounts are required to be included in its gross income for federal income tax purposes, and all amounts deductible for federal income tax purposes will also be deductible at the same time for state and local (not including Puerto Rico) income tax purposes.

(b)     Lessee Representations and Warranties.  Lessee hereby represents, warrants and covenants to Lessor that:

(i)     The Aircraft will constitute 7-year property under section 168(e) of the Code.

(ii)     The Aircraft will not be used predominantly outside of the United States or Puerto Rico within the meaning of sections 168(g)(1)(A) and 168(g)(4)(G) of the Code and will not constitute tax-exempt use property within the meaning of sections 168(g)(1)(B) and 168(h) of the Code.

(iii)     Neither Lessee nor any affiliate of Lessee will claim to be the owner of the Aircraft for federal, state or local (not including Puerto Rico) income tax purposes or will take any action or position in any filing for any federal, state or local (not including Puerto Rico) income tax purposes that is inconsistent with the intent of Lessor and Lessee that Lessor be treated as the owner of the Aircraft for income tax purposes and Lessee the lessee thereof.

(iv)    Lessee will report deductions for Basic Rent for federal, state and local (not including Puerto Rico) income tax purposes in the amounts and at the times provided for in the Lease.

(v)    The Aircraft will be deemed to be placed in service within the meaning of the Code no later than the Acceptance Date.

(vi)    Information provided to an appraiser, if any, was true, accurate and complete at the time given and at the commencement of the Basic Term.

(vii)    The Aircraft will not require any improvements, modifications or additions (other than ancillary items of removable equipment of a kind that are customarily selected and furnished by purchasers or lessees of similar equipment) in order to be rendered complete for its intended use by Lessee.

(viii)    Neither Lessee nor any affiliate of Lessee will make any alteration, modification or addition to the Aircraft that would cause the Aircraft to constitute "limited use property" within the meaning of Revenue Procedure 2001-28.

(ix)    Neither Lessee nor any affiliate of Lessee will make any "nonseverable improvement" within the meaning of Revenue Procedure 2001-28 to the Aircraft at any time during the Term other than nonseverable improvements permitted under Section 4.04(3) of Revenue Procedure 2001-28

(x)    Neither Lessee nor any affiliate of Lessee will make any substantial nonseverable improvements to the Aircraft unless required by law in order to operate the Aircraft.

(c)    Tax Indemnification.  If as a result of:  (i) the breach or inaccuracy of any representation, warranty or covenant of Lessee contained in the Lease (a "Breach"), or (ii) any act of Lessee or a failure by Lessee to perform an act required by the Lease (a "Lessee Act" and together with a Breach, a "Trigger Event"), a Determination (as defined below) shall be made that Lessor for any taxable year (A) shall lose or shall not be entitled to claim or shall suffer a disallowance, recapture, reduction, delay or deferral of, all or any portion of the Depreciation Deductions (any such event hereinafter referred to as a "Deduction Loss") or (B) must include any amount in gross income other than Anticipated Income (an "Income Inclusion"), (any of a Deduction Loss or an Income Inclusion being a "Tax Loss") then Lessor shall notify Lessee in writing of such fact, and Lessee shall pay to Lessor, as an indemnity, a lump-sum amount which, together with the amount of any interest, penalties and additions to tax which may be assessed by any governmental or taxing authority, shall be sufficient to put Lessor in the same after-tax position it would have been in had such Tax Loss not occurred (taking into account the assumptions set forth above).  The amounts payable pursuant hereto shall be payable upon demand by Lessor, accompanied by a statement describing in reasonable detail the Tax Loss and setting forth the computation of the amounts so payable.  For purposes of such computation it shall be assumed that Lessor could have fully utilized the deduction, credit, or other tax benefit or attribute at the maximum marginal Federal income tax rate as provided in the Code and at the highest applicable state and local income tax rates then applicable to Lessor.  Lessee shall not be obligated to make a payment to Lessor hereunder if the sole cause of the Tax Loss results from one or more of the following events:  (i) gross negligence or willful misconduct of Lessor; or (ii) a failure of Lessor timely to claim the Depreciation Deductions in Lessor's tax returns unless such failure shall result from circumstances other than those caused by Lessor.  For purposes hereof, Lessor shall mean and include any affiliated group of corporations within the meaning of section 1504 of the Code of which Lessor is a member for any year in which a consolidated income tax return is filed for such affiliated group.

(d)    Determination.  For the purpose of the Lease, a Determination shall mean and shall be deemed to have been made upon Lessor's receipt of notice of disallowance or similar notice from the applicable taxing authority or to any taxing authority of the tax increase or additional taxes resulting from a Tax Loss.

IN WITNESS WHEREOF, the parties hereto have each caused this Tax Addendum to be duly executed by their respective officers, hereunto duly authorized.

WACHOVIA FINANCIAL SERVICES, INC.,
as Lessor

By:_____

Name:_____

Title:_____

Date:_____


CIMA AVIACIÓN, LLC
as Lessee

By:_____

Name:_____

Title:_____

Date:_____

CHAR1\1037247v5